## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MAGELLAN TRADING COMPANY,
LLC,

     Plaintiff,

v.

DEBT MANAGEMENT PARTNERS,
LLC, ADAM MARCH, and
DANIEL VALENTINE,

     Defendants.

CIVIL ACTION FILE
NO. 1:14-CV—3928-MHC

## AMENDED COMPLAINT

COMES NOW Plaintiff Magellan Trading Company, LLC, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and files this Amended Complaint against Defendants Debt Management Partners, LLC, Adam March, and Daniel Valentine, respectfully showing the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff Magellan Trading Company, LLC is a Georgia limited liability company with its principal place of business in DeKalb County, Georgia. Chris Norman ("Norman") and Basel Kawouk ("Kawouk") are Magellan's principals.

2.

Defendant Debt Management Partners, LLC ("DMP") is a Delaware limited liability company that is not authorized to do business in Georgia and that does not maintain an office in Georgia. DMP may be served with a Summons and Complaint by service upon its registered agent in Delaware, United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904. This Court has personal jurisdiction over DMP pursuant to O.C.G.A. § 9-10-91(1) and O.C.G.A. § 9-10-91(3).

3.

Defendant Adam March is a resident of the State of New York. Mr. March may be served at his business address, 200 John James Audubon Parkway, Suite 102, Amherst, New York 14068 or at his residence, 6545 Belle Way, East Amherst, New York, 14051. This Court has personal jurisdiction over Mr. March pursuant to O.C.G.A. § 9-10-91(1) and O.C.G.A. § 9-10-91(3).

4.

Defendant Daniel Valentine is a resident of the State of New York. Mr. Valentine may be served at his business address, 200 John James Audubon Parkway, Suite 102, Amherst, New York 14068 or at his residence, 5145 Kraus Road, Clarence, New York, 10431. This Court has personal jurisdiction over Mr. Valentine pursuant to O.C.G.A. § 9-10-91(1) and O.C.G.A. § 9-10-91(3).

5.

Venue is proper pursuant to 28 U.S.C. § 1391.

## **FACTUAL BACKGROUND**

6.

Plaintiff Magellan Trading Company, LLC ("Magellan") is an industry leading debt acquisition and selling company that specializes in providing consulting services for debt buyers and sellers as well as collection agencies.

7.

Defendant Debt Management Partners, LLC ("DMP") is engaged in the business of buying and selling non-performing receivables.   Defendants Adam March and Daniel Valentine are DMP's principals.

8.

Magellan and Defendants have an on-going business relationship in which Magellan has brokered or otherwise facilitated debt sales for DMP and has purchased debt from DMP.

9.

On or about February 20, 2014, Magellan purchased $3,999,372.00 in outstanding debt from DMP (the "February Purchase").  During a February 14, 2014

telephone call between Valentine and Norman, Valentine represented to Norman that Magellan would receive all rights and title to and all interest in the debt it purchased, including the exclusive right to collect the debt.   Magellan paid $87,500 for the February Purchase.

10.

The February Purchase is evidenced by two Bills of Sale signed by Adam March.  True and correct copies of the Bills of Sale evidencing the February Purchase are attached hereto as **<u>Exhibit A</u>**.

11.

On March 6, 2014, Magellan purchased $5,000,022.00 in outstanding debt from DMP (the "March Purchase").  Magellan paid DMP $200,000.88, for the March Purchase.   On February 27, 2014, during a face-to-face meeting between Magellan and DMP at a conference in Orlando, Florida, March and Valentine represented to Norman and to Kawouk that Magellan would receive all rights and title to and all interest in the the debt it purchased, including the exclusive right to collect on that debt.

12.

The March Purchase is evidenced by a Bill of Sale signed by Adam March.  A true and correct copy of the Bill of Sale evidencing the March Purchase is attached

hereto as **Exhibit B**.

13.

Magellan received electronic files containing information concerning the accounts it purchased, including but not limited to, the debtor's name and social security number, the amount owed, the issuer's name, and the account number assigned by the issuer.

14.

DMP referred to the accounts it provided to Magellan as the Evergreen Debt and indicated that the original creditor was "Evergreen."

15.

Magellan resold $2,000.007.00 of the debt it acquired in the February Purchase and all of the March Purchase (together, the "Evergreen Debt") to Cuzco Capital Investment Management, LLC ("Cuzco") who began attempting to collect the debts.[1]

16.

On March 12, 2014, Magellan began receiving reports from Cuzco that the accounts comprising the Evergreen Debt were actually originated by Bahama Marketing Group ("BMG") and that other collection agencies had already called the

---

[1] Magellan sold the remaining $1,999,365.00 of the February Purchase to another third party, and that portion of the February Purchase is not involved in this litigation.

debtors about the same debts.   In addition, several of the debtors reported that they had never heard of Evergreen.

17.

Magellan conducted its own investigation to determine the validity of the Evergreen Debt.  As part of its investigation, Magellan asked another large national debt purchaser, National Credit Adjusters, LLC ("NCA"), to cross-reference the accounts comprising the Evergreen Debt with NCA's account database.

18.

NCA matched 91.4% of the "Evergreen Debt" to accounts previously purchased by NCA.   A true and correct copy of the e-mail correspondence from NCA to Magellan advising Magellan of the 91.4% match is attached hereto as **Exhibit C**.

19.

Magellan informed Cuzco of NCA's findings.   Once Magellan confirmed that the Evergreen Debt was double-sold, Cuzco ceased collection efforts on the accounts.

20.

Magellan informed DMP that the accounts it sold to Magellan were sold more than once and explained the findings of Magellan's investigation.

21.

Magellan sought a refund from DMP of the amounts that Magellan paid for the

February and March Purchases.  DMP failed and refused to cooperate with Magellan to reach a reasonable resolution.  As a result, Magellan was forced to retain counsel to pursue this matter.

22.

Magellan, through counsel, continued to try in good faith to resolve its dispute with DMP concerning the February and March Purchases.

23.

As part of its good-faith effort to resolve its dispute with DMP, Magellan returned all accounts that had not been collected by Cuzco.

**COUNT I**
**BREACH OF CONTRACT**

24.

Magellan realleges and incorporates paragraphs 1 through 23 as if set forth fully herein.

25.

In February 2014, Magellan and DMP entered into an oral agreement pursuant to which DMP agreed to sell and Magellan agreed to purchase $3,999,372.00 in outstanding debt for $87,500.

26.

The February 2014 oral agreement between Magellan and DMP constitutes a

valid  and enforceable oral contract (the "February Contract").

27.

The February Contract required DMP to provide Magellan all rights, title, and interest in $3,999,372.00 in outstanding debt, including the exclusive right to collect that debt.

28.

DMP breached the February Contract because the debt file that Magellan received pursuant to the contract misidentified critical information concerning the accounts comprising the debt and because Magellan did not receive all rights and title to and all interest in the the debt it purchased, including the exclusive right to collect on that debt.  In fact, much of the debt had already been collected or determined to be uncollectible.

29.

In March 2014, Magellan and DMP entered into an oral agreement pursuant to which DMP agreed to sell, and Magellan agreed to purchase, all rights and title to and all interest in $5,000,022.00 in outstanding debt for $200,000.88.

30.

The March 2014 oral agreement between Magellan and DMP constitutes a valid  and enforceable oral contract (the "March Contract").

31.

The Sales Contract required DMP to sell Magellan all right, title, and interest in $5,000,022.00 in outstanding debt, including the exclusive right to collect that debt.

32.

DMP breached the March Contract because the debt file that Magellan received pursuant to the contract misidentified critical information concerning the accounts comprising the debt and because Magellan did not receive all rights and title to and all interest in the the debt it purchased, including the exclusive right to collect on that debt.  In fact, much of the debt had already been collected or determined to be uncollectible.

33.

As a result of DMP's breaches of the February Contract and the March Contract, Magellan suffered at least **$292,505.00** in compensatory damages.

34.

DMP's breaches of the February Contract and the March Contract damaged Magellan's reputation with its customers, including Cuzco and other debt purchasers. As a result, Magellan suffered additional damages in an amount to be proven at trial.

## COUNT II
## FRAUD

35.

Plaintiff realleges and incorporates paragraphs 1 through 34 as if set forth fully herein.

36.

During a February 14, 2014 telephone call between Valentine and Norman, Valentine represented to Norman that Magellan would receive all rights and title to and all interest in the debt it purchased in the February Purchase, including the exclusive right to collect the debt.

37.

During a face-to-face meeting between Magellan and DMP at a conference in Orlando, Florida on February 27, 2014, Valentine and March represented to Norman and Kawouk that Magellan would receive all rights and title to and all interest in the debt it purchased in the March Purchase, including the exclusive right to collect the debt.

38.

Magellan did not receive all rights and title to and all interest in the debt it purchased in the February and March purchases or the exclusive right to collect the

debt.  Accordingly, Defendants' representations were false.

39.

At the time Defendants made the above representations, they either knew the representations were false, possessed constructive knowledge that the representations were untrue, or made reckless representations of the truthfulness of their representations without knowledge.

40.

Defendants' statements that Magellan would receive all rights and title to and all interest in the Evergreen Debt, including the exclusive right to collect on that debt, were material to Magellan's decision to purchase the Evergreen Debt.

41.

Defendants made the above false representations in order to induce Magellan to purchase the Evergreen Debt.

42.

Magellan relied on Defendants' false representations to purchase the Evergreen Debt.

43.

In light of their ongoing business relationship, Magellan was justified in relying on Defendants' false representations.

11

44.

As a result of Magellan's reliance on Defendants' false representations, Magellan suffered at least **$292,505.00** in compensatory damages.

45.

As a result of DMP's fraud, Magellan's reputation with its customers and potential customers was damaged.  As a result, Magellan suffered additional damages in an amount to be proven at trial.

## COUNT III
## NEGLIGENT MISREPRESENTATION

46.

Magellan realleges and incorporates paragraphs 1 through 45 as if set forth fully herein.

47.

Defendants falsely represented to Magellan that Magellan would receive all rights and title to, and all interest in, the Evergreen Debt, including the exclusive right to collect on that debt.

48.

Persons in Defendants' position acting with reasonable care would have known that the statements they made to Magellan were false when made.

49.

In light of Defendants' ability to know the true status of Evergreen Debt and Defendants' ongoing business relationship with Magellan, Magellan reasonably relied on Defendants' false representations.

50.

As a result of Magellan's reliance on Defendants' false representations, Magellan suffered at least **$292,505.00** in compensatory damages.

51.

As a result of DMP's misrepresentations, Magellan's reputation with its customers  and potential customers was damaged.  As a result, Magellan suffered additional damages in an amount to be proven at trial.

## <u>COUNT IV</u>
## <u>VIOLATION OF GEORGIA RICO ACT</u>

52.

Magellan realleges and incorporates paragraphs 1 through 51 as if set forth fully herein.

53.

Defendants used email to exchange information with Magellan concerning the February Purchase and the March Purchase.

54.

Defendants used email to transfer the files containing the accounts that Magellan purchased pursuant to the February Purchase and the March Purchase.

55.

Defendants received payment for the March Purchase by wire transfer from Magellan.

56.

Defendants used the internet and bank wires as part of its scheme to defraud Magellan.

57.

Defendants' conduct constitutes wire fraud within the meaning of 18 U.S.C. § 1343 and constitutes a racketeering activity within the meaning of 18 U.S.C. § 1961.

58.

Magellan has learned of other instances in which Defendants carried out similar fraudulent schemes.  In particular, Magellan has learned that Defendants also completed multiple sales of the same debts they claimed were Evergreen accounts to URG Online and to other debt purchasers through brokers affiliated with Big Sky Research and Phoenix Asset Group.

59.

Any racketeering activity under 18 U.S.C. § 1961 is, by definition, a racketeering activity under O.C.G.A. § 16-14-3(9)(A)(xxix).

60.

Each of Defendants' multiple violations of 18 U.S.C. § 1343 were not isolated incidents but were part of a scheme to obtain payments by fraudulent means.

61.

Defendants' multiple violations of 18 U.S.C. § 1343 constitutes a "pattern of racketeering activity" within the meaning of O.C.G.A. § 16-14-3(8).

62.

Defendants acquired money as a result of its racketeering activity in violation of O.C.G.A. § 16-14-4(a).

63.

Defendants' pattern of racketeering activity caused Magellan to suffer at least **$292,505.00** in damages.   Magellan may recover such damages pursuant to O.C.G.A. § 16-14-6(a).

64.

Magellan may recover three (3) times the actual damages it sustained as a result of Defendants' racketeering activity, attorneys' fees, and costs of investigation and litigation pursuant to O.C.G.A. § 16-14-6(c).

## COUNT V - PUNITIVE DAMAGES

65.

Magellan realleges and incorporates paragraphs 1 through 62 as if set forth fully herein.

66.

Defendants' conduct as set forth above demonstrates such willful misconduct, malice, wantonness, or that entire want of care which would raise the presumption of conscious indifference to the consequences.

67.

Magellan is entitled to punitive damages in an amount to be determined by the enlightened conscience of the jury to punish Defendants and to deter such misconduct.

## COUNT VI - ATTORNEYS' FEES

68.

Magellan realleges and incorporates paragraphs 1 through 67 as if set forth fully herein.

69.

Defendants have acted in bad faith and been stubbornly litigious in their refusal to reasonably repay Magellan the amounts Defendants received from Magellan for the double-sold debt, thus, causing Magellan unnecessary trouble and expense, such that Magellan is entitled to recover the costs and expenses of litigation including attorneys' fees and costs in accordance with O.C.G.A. § 13-6-11.

WHEREFORE, Magellan respectfully requests that the Court:

a)      Enter judgment in favor of Magellan on all Counts in the Complaint and award compensatory damages, treble damages, punitive damages, and attorneys' fees to Magellan;

b)      Award Magellan the costs of this lawsuit; and

c)      Award Magellan such other and further relief as the Court deems just and proper.

This 5th day of January, 2015.

/s/ Bryan M. Knight
Bryan M. Knight
Georgia Bar No. 142401
Sherri G. Buda
Georgia Bar No. 093399

17

**KNIGHT JOHNSON, LLC**
One Midtown Plaza
1360 Peachtree Street, Suite 1201
Atlanta, Georgia 30309
P: (404) 228-4822
F: (404) 228-4821
bknight@knightjohnson.com
sbuda@knightjohnson.com
*Attorneys for Plaintiff*

# EXHIBIT
# "A"

## BILL OF SALE

**Debt Management Partners, LLC** ("Seller") for value received and in accordance with the terms of the Accounts Receivables Purchase Agreement, dated as of February 21, 2014, (the "Agreement"), between Seller and **Magellan Trading Company, LLC** ("Buyer"), does hereby sell, assign and convey to Buyer, its successors and assigns all right title and interest of Seller in and to those certain Accounts (as defined in the Agreement) the accounts listed in Exhibit "A", without recourse and without representation of, or warranty of collectability, or otherwise, except to the extent stated in the Agreement.

Principal value of accounts:    $2,000,007.00

Type of Accounts:  Evergreen – Direct (zero agency) PayDay Debt

Executed this 21st day of February 2014

**Debt Management Partners, LLC**

By: _____

Name:   Adam Marsh     Adam March

Title:    President

**Magellan Trading Company, LLC**

By: _____

Name:  Chris Norman

Title:    President

## BILL OF SALE

**Debt Management Partners, LLC** ("Seller") for value received and in accordance with the terms of the Accounts Receivables Purchase Agreement, dated as of February 20, 2014, (the "Agreement"), between Seller and **Magellan Trading Company, LLC** ("Buyer"), does hereby sell, assign and convey to Buyer, its successors and assigns all right title and interest of Seller in and to those certain Accounts (as defined in the Agreement) the accounts listed in Exhibit "A", without recourse and without representation of, or warranty of collectability, or otherwise, except to the extent stated in the Agreement.

Principal value of accounts:   $1,999,365.00

Type of Accounts:  Evergreen – Direct (zero agency) PayDay Debt

Executed this 20th day of February 2014

**Debt Management Partners, LLC**

By:_____
Name:   Adam Marsh          Adam March
Title:   President

**Magellan Trading Company, LLC**

By:_____
Name:  Chris Norman
Title:   President

# EXHIBIT "B"

## BILL OF SALE

**Debt Management Partners, LLC** ("Seller") for value received and in accordance with the terms of the Accounts Receivables Purchase Agreement, dated as of  March 5, 2014, (the "Agreement"), between Seller and **Magellan Trading Company, LLC** ("Buyer"), does hereby sell, assign and convey to Buyer, its successors and assigns all right title and interest of Seller in and to those certain Accounts (as defined in the Agreement) the accounts listed in Exhibit "A", without recourse and without representation of, or warranty of collectability, or otherwise, except to the extent stated in the Agreement.

Principal value of accounts:   $5,000,022.00

Type of Accounts:  Evergreen – Direct (zero agency) PayDay Debt

Executed this 5th day of March 2014

**Debt Management Partners, LLC**

By:_____

Name:    Adam Marsh     Adam March

Title:    President

**Magellan Trading Company, LLC**

By:_____

Name:  Chris Norman

Title:   President

# EXHIBIT
# "C"



## NCA Comparison - Full Data Provided

4 messages

**Joshua Minney** <josh@magellantradingcompany.com>      Thu, Mar 27, 2014 at 2:41 PM
To: Jack Mahoney <Jack@ncaks.com>
Cc: Chris Norman <chris@magellantradingcompany.com>

Jack,

I was given instruction by Chris Norman to provide you with the files which can be found within NCA's directory on Magellan Trading Company's FTP server (username: **ncaftp**) named [BMG & Evergreen Files - For NCA Comparison.zip]. Chris indicated that Brad would have informed you of the issue and to be expecting my e-mail with the corresponding data.

These spreadsheets have been provided with full consumer and account data available (and as originally received with no Magellan alteration for formatting or any other purpose) to run against NCA-owned portfolios by SSN and/or original creditor account number to highlight any data which matches NCA's owned account. Based upon patterns from information received on our end, the original creditor's account numbers as listed are likely truncated versions of the number listed within NCA's system. It appears that, on most accounts identified as potential problems, the last three digits of the original creditor's account number may have been removed and/or altered.

If you have any questions or difficulty accessing the information as provided, please let me know.

Thank you,
--

**Joshua Minney**
**Administration**



**2107 North Decatur Road, Suite 327**
**Atlanta, GA 30033**

**josh@magellantradingcompany.com**
**Phone: (404) 445-2013 x. 507**
**Fax: (404) 975-0969**

---

**CONFIDENTIALITY NOTICE:** This message may contain confidential information and is intended only for the party or parties named above. If you have received this e-mail in error, send a separate e-mail notification to

the sender of the error and immediately delete this e-mail and, if applicable, all attachments received. The sender DOES NOT authorize any party except for the intended recipient(s) to copy, distribute, print, disseminate, or publish the contents or any attachments to this confidential electronic communication.

---

**Joshua Minney** <josh@magellantradingcompany.com>       Fri, Mar 28, 2014 at 11:35 AM
To: Jack Mahoney <Jack@ncaks.com>
Cc: Chris Norman <chris@magellantradingcompany.com>

Jack,

I'll create a login just for you, give me a few minutes and you should have an e-mail with the credentials.

### Joshua Minney
**Administration**



**2107 North Decatur Road, Suite 327
Atlanta, GA 30033**

**josh@magellantradingcompany.com**
**Phone: (404) 445-2013 x. 507
Fax: (404) 975-0969**

**CONFIDENTIALITY NOTICE:** This message may contain confidential information and is intended only for the party or parties named above. If you have received this e-mail in error, send a separate e-mail notification to the sender of the error and immediately delete this e-mail and, if applicable, all attachments received. The sender DOES NOT authorize any party except for the intended recipient(s) to copy, distribute, print, disseminate, or publish the contents or any attachments to this confidential electronic communication.

On 3/28/2014 11:26 AM, Jack Mahoney wrote:

> I don't have the FTP information to access the file. I'm not sure who in the office does have access, but please instruct them ( or let me know who ) to pull down the file for me.

**From:** Joshua Minney [mailto:josh@magellantradingcompany.com]
**Sent:** Thursday, March 27, 2014 1:42 PM
**To:** Jack Mahoney
**Cc:** Chris Norman
**Subject:** NCA Comparison - Full Data Provided
**Importance:** High

[Quoted text hidden]

**DoubleCheck** identified this as **CLEAN**. Give feedback: This is SPAM · More

---

**Jack Mahoney** <Jack@ncaks.com>        Fri, Mar 28, 2014 at 3:46 PM
To: Joshua Minney <josh@magellantradingcompany.com>

Your message

    To: Jack Mahoney
    Subject: Re: NCA Comparison - Full Data Provided
    Sent: Friday, March 28, 2014 10:35:39 AM (UTC-06:00) Central Time (US & Canada)

was read on Friday, March 28, 2014 2:45:47 PM (UTC-06:00) Central Time (US & Canada).

---

**Jack Mahoney** <Jack@ncaks.com>        Mon, Mar 31, 2014 at 10:31 AM
To: Joshua Minney <josh@magellantradingcompany.com>
Cc: Chris Norman <chris@magellantradingcompany.com>, Brad Hochstein <brad@ncaks.com>

Joshua/Chris:


I've taken your four files and combined certain fields into one file for comparison. I then took the 'IssuerAccountNumber' plus the last four of SSN and matched it against our BMG Client Account Number minus the last three digits plus the last four of the SSN as a key (to help ensure that it's the same person). **Using this process, I was able to match 91.4% of your file to a BMG account in our system.**


Seems that I am unable to place files into your FTP. Let me know when I can do that and I will place the four original files along with the Excel file 'FilesCombined-MatchUp' which has my results.


Fields in the 'FilesCombined-MatchUp' data file:

File = Your file the data was pulled from (I relabeled your files to correspond)

Key = IssuerAccountNumber + Last 4 of SSN

Yellow highlighted fields are fields from your data files.

Green highlighted fields are the match up to the 'BMG Match' sheet provided based on the key.

*FYI - In some cases we may have multiple BMG accounts for the same consumer because they opened accounts under different BMG lenders. The process will match to the first in the list.

Example: key number 1442956847081 for Krystle Umpierre-Succes returned our account id 5698509 in the match up, but she also has account id 5698511 showing in the 'BMG Match' data.

Any questions, let me know.



**From:** Joshua Minney [mailto:josh@magellantradingcompany.com]
**Sent:** Thursday, March 27, 2014 1:42 PM
**To:** Jack Mahoney
**Cc:** Chris Norman
**Subject:** NCA Comparison - Full Data Provided
**Importance:** High

[Quoted text hidden]

**DoubleCheck** identified this as **CLEAN**. Give feedback: This is SPAM · More

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MAGELLAN TRADING COMPANY,
LLC,

     Plaintiff,

v.

DEBT MANAGEMENT PARTNERS,
LLC, ADAM MARCH, and
DANIEL VALENTINE,

     Defendants.

CIVIL ACTION FILE
NO. 1:14-CV—3928-MHC

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing AMENDED COMPLAINT

by filing same through the Court's CM/ECF system, which will automatically send

email notification of such filing to:

Theodore B. Eichelberger
Aaron Karl Block
Alston & Bird LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309

Gerald Walsh
David Gutowski
Zdarsky, Sawicki & Agostinelli LLP
Suite 404
298 Main Street
Buffolo, NY 14202

Respectfully submitted this 5th day of January, 2015.

/s/ Bryan M. Knight
Bryan M. Knight, Esq.
Georgia Bar No. 142401

19