## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **MAGELLAN TRADING COMPANY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14-cv-3928** |
| | ) | |
| **DEBT MANAGEMENT PARTNERS, LLC, ADAM MARCH, AND DANIEL VALENTINE,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TRANSFER VENUE AS TO PLAINTIFF MAGELLAN'S AMENDED COMPLAINT

Defendants Debt Management Partners, LLC ("DMP"), Adam March, and Daniel Valentine (collectively the "DMP Defendants") submit this brief in support of their motion to dismiss Plaintiff Magellan Trading Company, LLC's ("Magellan") Amended Complaint due to lack of personal jurisdiction, improper venue, failure to join a party under Rule 19, and failure to state a claim. If the Court deems that further proceedings are warranted, the Court should transfer this action to the United States District Court for the Western District of New York.

1

## <u>STATEMENT OF FACTS</u>

This matter is essentially a contract dispute involving mostly New York-based companies that Plaintiff has dragged into Georgia and over-pled as a RICO case, while at the same time under-developing the factual allegations.  At its core, this is a case in which the plaintiff is dissatisfied with its profit margin in a speculative business venture, which is not the basis for a lawsuit because there is no allegation that the Defendants made any guarantee of success.

Defendant DMP is a Delaware limited liability company with its principal place of business in Erie County, New York.  DMP is in the business of buying and selling non-performing accounts receivable.  Defendants March and Valentine are effectively the principals of DMP; they are shareholders and officers of the sole member of DMP and are also officers of DMP.  Both March and Valentine reside in Erie County, New York.  *See* January 22, 2015 Aff. of Adam March ("March Aff.") ¶¶ 1-5, attached as **Exhibit A**; January 22, 2105 Aff. of Daniel Valentine ("Valentine Aff.") ¶¶ 1-5, attached as **Exhibit B**.

In late February 2014, Chris Norman, Atlanta-based principal of Plaintiff Magellan Trading Company, LLC ("Magellan" or "Plaintiff"), approached March and Valentine at a conference in Orlando, Florida and inquired about purchasing

accounts receivable from DMP on behalf of Magellan.  March Aff., **Ex. A**, ¶ 6;

Valentine Aff., **Ex. B**, ¶ 6.  DMP and Magellan negotiated the sale of

approximately $5 million in debt to Magellan at a 4% purchase price.  *Id.*

That steep discount is a reflection of how this industry functions, as

"industry leading" firms like Magellan are well aware.  *See* Am. Compl. [DE 7] at

¶ 6.  The debt accounts at issue tend to arise from modest sub-prime consumer

loans that have already been charged off by the originating lender—i.e., the debt

accounts are inherently risky.  *See* Valentine Aff., **Ex. B**, ¶ 5.  It is common in the

industry for these accounts to be sold and re-sold multiple times, as Magellan itself

did here.  Only a very small percentage of non-performing accounts will ever be

collectible, and likely will not be collectible for the full face value of the debt.  So

buyers like Plaintiff Magellan acquire large portfolios of debt for pennies on the

dollar, speculating that they can collect slightly more pennies on the dollar and

thereby profit by volume.  The portfolios include thousands of accounts listed in

spreadsheet form.  No one in this industry seriously believes that every account, or

even a majority of the accounts, is fully collectible.  If that were so, sellers like

DMP would quickly go bankrupt selling them at 4 cents on the dollar as in the

transaction at issue here.

The discussions and negotiations that resulted in the deal took place during face-to-face meetings or by phone or email between and among March, Valentine, and Norman while the parties were in Orlando, Florida.  March Aff., **Ex. A**, ¶ 6; Valentine Aff., **Ex. B**, ¶ 6.  DMP transferred the accounts to Magellan and Magellan wired the purchase price to DMP's New York bank, on or about March 6, 2014 (which is why Magellan refers to it as the March transaction).  *Id*.  The sale closed without a written contract.  *Id*.  March and Valentine communicated with Magellan solely in their capacities as officers of DMP and have never engaged in any business transaction with Magellan.[1]  March Aff., **Ex. A**, ¶ 15; Valentine Aff., **Ex. B**, ¶ 17.

DMP does not engage in business in Georgia.  March Aff., **Ex. A**, ¶ 5; Valentine Aff., **Ex. B**, ¶ 5.  March and Valentine have never engaged in any business in Georgia short of driving or flying through or attending a brief, unrelated conference several years ago.  March Aff., **Ex. A**, ¶ 16; Valentine Aff., **Ex. B**, ¶ 18. No Georgia residents were account holders of the underlying accounts receivable that DMP sold to Magellan.  March Aff., **Ex. A**, ¶ 8; Valentine Aff., **Ex.**

---

[1] Defendants March and Valentine do not concede that they are properly named in their individual capacity, particularly given that New York law may apply to this dispute, and reserve the right to raise that issue.

**B**, ¶ 7.

Magellan alleges that DMP participated in an earlier February 2014 deal as a "broker."  *See* Compl. ¶ 9; *but cf.* Am. Compl. (apparently abandoning that theory).  However, DMP was never a party or broker to any such transaction, and never received any fee or payment of any kind from any transaction with Magellan, except the March 6, 2014 deal.  March Aff., **Ex. A**, ¶ 7; Valentine Aff., **Ex. B**, ¶ 7. Upon information and belief, Magellan purchased debt in February 2014 from another company, named RJA Capital, Inc., a New York business corporation, after RJA purchased the debt from DMP.[2]  *Id.*

On November 7, 2014, Plaintiff filed a complaint against DMP, March, and Valentine in the Superior Court  of DeKalb County, Georgia, which the DMP Defendants removed to this Court on December 10, 2014.  After the DMP Defendants moved to dismiss and/or transfer venue [DE 2], Plaintiff Magellan filed an Amended Complaint [DE 7] that is just as flawed as the original.

Plaintiff Magellan alleges breach of an oral contract with respect to the

---

[2] After Magellan's purchases from DMP and RJA had closed, Norman drafted several documents he called "Bills of Sale" and emailed them to DMP and requested that DMP sign them.  The documents were inaccurate in several respects, including their reference to a February transaction between Magellan and DMP that never happened, but Defendant March mistakenly signed them.  *See* March Aff., Ex. A, ¶ 10; Valentine Aff., Ex. B, ¶ 10.

March 6, 2014 sale, and with respect to Magellan's February 2014 debt purchase from RJA Capital (although Magellan omitted RJA Capital from the allegations). Plaintiff also alleges causes of action against the DMP Defendants for fraud, negligent misrepresentation, and for alleged violation of the Georgia RICO statute, based upon alleged communication between DMP and Magellan concerning Magellan's February and March 2014 debt deals. Plaintiff seeks compensatory damages in the amount of $292,505.00, plus treble damages under the Georgia RICO statute, attorneys' fees, punitive damages and costs.

This lawsuit cannot proceed, at least not as currently constituted in this Court, for a variety of reasons. **First**, the Court lacks personal jurisdiction over the DMP Defendants in this matter because they lack sufficient contacts with Georgia under either the Georgia long-arm statute or the Due Process clause of the Fifth and Fourteenth Amendments to the United States Constitution.

**Second**, Plaintiff Magellan failed to name RJA Capital, which is an indispensable party. The February 2014 transaction at issue was between Magellan and RJA, not the DMP Defendants. Since the DMP Defendants are not parties to any alleged agreement between Plaintiff and RJA Capital concerning the February 2014 transaction, no causes of action arising from that transaction against the DMP

6

Defendants have any merit, and the Complaint is defective, under Rule 19, for failure to join an indispensable party.  Because it appears that this Court cannot acquire personal jurisdiction over RJA Capital, the action should be dismissed.

*Third*, on the merits, the Amended Complaint fails to plausibly articulate a claim for relief under Rules 12(b)(6) and 9(b).  The bare-bones Complaint does not contain any meaningful factual information concerning the underlying allegations, which are contradicted by Plaintiff's own exhibits.

*Fourth*, this action should be dismissed for improper venue or, in the alternative, transferred to the Western District of New York, where the DMP Defendants (and RJA Capital) are subject to personal jurisdiction and where key non-party witnesses and documents are located.

## ARGUMENT AND CITATION OF AUTHORITIES

### I.  The Court Lacks Personal Jurisdiction Over the DMP Defendants.

The DMP Defendants are New York residents, do not transact business within the state of Georgia, and do not own, use or possess real property situated in the state of Georgia.  *See* O.C.G.A. § 9-10-91.  For personal jurisdiction to attach, Georgia's long-arm statute requires that Plaintiff's claims arise from the DMP Defendants' transaction of substantial business in Georgia.  *See Diamond*

*Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249 (11th Cir. 2011).

Plaintiff Magellan has the burden to establish a *prima facie* case of jurisdiction to survive a motion to dismiss. *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 626 (11th Cir. 1994). "The court construes the allegations in the complaint as true [only] to the extent that they are uncontroverted by defendant's evidence." *Paul, Hastings, Janofsky & Walker v. City of Tulsa, Okla.*, 245 F. Supp. 2d 1248, 1253 (N.D. Ga. 2002) (citations omitted). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2011).

"In a diversity action, a federal court has personal jurisdiction over a non-resident defendant to the extent permitted by the forum state's long-arm statute." *Nippon Credit Bank, Ltd. v. Matthews*, 291 F.3d 738, 746 (11th Cir. 2002). The Georgia long-arm statute provides that a court may exercise personal jurisdiction over any nonresident only to the extent the defendant's alleged conduct at issue satisfies one of the statutory requirements of OCGA § 9-10-91.

None of the statutory bases applies to the DMP Defendants. The only

arguable basis is OCGA 9-10-91(1), which applies only to the extent the defendant "transacts any business within this state."[3] That is a high standard.  As the Georgia Supreme Court and the Eleventh Circuit have explained, Georgia's long-arm statute is more limited than that of most states, and does not reach to the full extent of the Due Process Clause: "mere minimum contacts in a due process sense" are insufficient.  *Diamond Crystal Brands*, 593 F.3d at 1263 (interpreting *Innovative Clinical & Consulting Servs. v. First Nat'l Bank of Ames*, 279 Ga. 672, 620 S.E.2d 352 (2005), and OCGA § 9-10-91).  Instead, OCGA § 9-10-90(1) requires a deliberate and substantial course of conduct involving Georgia.

This case is nowhere close to the marginal case for transacts-business jurisdiction in *Diamond Crystal Brands*.  There, the defendants engaged in fourteen Georgia-centered transactions in six months, all of which required the subject goods—$1.9 million worth of physical goods—to be delivered in Savannah for resale from Savannah.  *Id*. at 1267; 1270.  That amounted to a

---

[3] Defendants do not own, use, or possess any real property in Georgia as required by OCGA § 9-10-91(4).  They did not commit a tortious act, or any act, in this state as required by OCGA § 9-10-91(2).  And they do not maintain any kind of continuous or systematic marketing contact with Georgia or derive substantial revenue from Georgia residents as required by OCGA § 9-10-91(3).  March Aff., **Ex. A**, ¶ ¶3-5; Valentine Aff., **Ex. B**, ¶ 3-5.  The other statutory bases for jurisdiction, such as those relating to family law matters, are even less relevant.

deliberate, extensive, and ongoing relationship with the state. *Id*. at 1266-1267.

Here, by contrast, the single, small transaction at issue was negotiated and agreed to in Florida.  None of the subject receivables is the debt of a Georgia resident, and Magellan has sold most of the outstanding receivables back to a New York company, Cuzco Capital Investment Management, LLC.  Am. Compl. ¶ 15; March Aff., **Ex. A**, ¶¶ 6; 8; 9; Valentine Aff., **Ex. B**, ¶¶ 6; 8; 9.  Plaintiff may point to incidental telephone or email contact prior to or after the negotiations, but "[m]ere telephone or mail contact with an out-of-state defendant, or even the defendant's visits to this state, is insufficient to establish the purposeful activity with Georgia required by the 'Long Arm' statute." *White v. Roberts*, 216 Ga. App. 273, 274, 454 S.E.2d 584, 586 (1995) (quotation marks and citations omitted) (rejecting personal jurisdiction under OCGA § 9-10-91(1)).

Even assuming for the sake of argument that the parties engaged in two transactions instead of one does not affect the outcome.  The alleged February transaction was about a third of the value of the March transaction, and only half of the February transaction—or one-sixth the value of the March transaction—is at issue.  Am. Compl. ¶¶ 9; 11; 15 n.1.  That does not change the fundamentally limited character of the DMP Defendants' contacts with Georgia.

These incidental contacts cannot be the exception that swallows the rule, which requires substantial business contacts with Georgia relating to the transaction at issue. *See Gust v. Flint*, 257 Ga. 129, 129-130, 356 S.E.2d 513, 513-514 (1987) (rejecting personal jurisdiction where the defendants' contacts with Georgia included a few mailings and telephone calls with the Georgia-based plaintiff; receipt of payment from the plaintiff from Georgia; and a refusal to ship the paid-for goods). Minor, unrelated dealings between the parties years ago are likewise insufficient to confer jurisdiction as to the subject of this litigation.

Plaintiff has not alleged facts to establish sufficient contact with Georgia, much less put forth record evidence to justify haling Defendants into court here. Accordingly, Defendants have not transacted sufficient business within the meaning of OCGA § 9-10-91(1) and cannot be subject to personal jurisdiction here on statutory grounds.

Nor would the Due Process Clause permit the exercise of personal jurisdiction. Although Georgia's long-arm statute does not reach to the extent of the Due Process Clause, it remains an outer limit that Georgia law cannot traverse. Defendants' contacts are again far removed from the "close case" for Due-Process-sufficient jurisdiction in *Diamond Crystal Brands*. 593 F.3d at 1269. There, the

11

defendant purposely engaged in a "substantial relationship in which [the defendant] deliberately associated with Georgia," as described above.  593 F.3d at 1270.  The defendant's contacts barely crossed the Due Process line through a "substantial and ongoing relationship with a Georgia manufacturer by engaging in fourteen transactions in six months."  *Id*. at 1273-1274.  Here, by contrast, the DMP Defendants' contacts with Georgia were far more limited.

Further, as described below with respect to Defendants' alternative request to transfer venue to the Western District of New York, traditional notions of fair play and substantial justice point away from Georgia: the relevant witnesses and documents are in New York; New York law may well apply; and New York has as much of an interest in resolving commercial disputes of this nature as does Georgia, particularly where several of the commercial parties whose conduct is at issue reside in New York.

The DMP Defendants have not purposefully availed themselves of the privilege of conducting activities in Georgia.  The Court, therefore, does not have personal jurisdiction over the DMP Defendants, and the Court should dismiss the Complaint in its entirety.

### II. Plaintiff's Complaint Should Be Dismissed for Failure to Join a Necessary Party Under Rule 19.

Plaintiff has failed to join a necessary party to this action. Plaintiff bought the accounts receivable in the so-called February Purchase from RJA Capital, not DMP, as Magellan concedes in its original Complaint. *See* Compl. ¶¶ 9-10 (describing DMP as a "broker"). Contrary to Plaintiff Magellan's unelaborated allegations, however, DMP was not a "broker" of that transaction. Instead, DMP sold some of the subject receivables to RJA Capital, who subsequently re-sold them to Plaintiff Magellan. March Aff., **Ex. A**, ¶ 7; Valentine Aff., **Ex. B**, ¶ 7.

The Court may dismiss an action under Rule 12(b)(7) where the plaintiff fails to "join a party under Rule 19." Fed. R. Civ. P. 12(b)(7); *CPR--Cell Phone Repair Franchise Sys., Inc. v. Nayrami,* 896 F. Supp. 2d 1233, 1237 (N.D. Ga. 2012). Rule 19 establishes a two-part inquiry to determine whether a party must be joined. Under Rule 19(a), the court must first determine "whether the person in question is one who should be joined if feasible." *Focus on the Family v. Pinellas Suncoast Transit Auth.,* 344 F.3d 1263, 1280 (11th Cir.2003) (quoting *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.,* 669 F.2d 667, 669 (11th Cir.1982)). Under Rule 19(b), for all such necessary parties, the court then analyzes whether

13

the litigation can continue if the party cannot be joined. *Id.*

RJA Capital's conduct is indispensably tied to the disputed February 2014 transaction and RJA Capital must be joined as a party under Rule 19. Without RJA in this case, Plaintiff may attempt to subject DMP to liability for RJA Capital's own actions. Forcing DMP, in the event of an adverse judgment, to seek contribution from RJA Capital is wasteful and contrary to the policy underlying Rule 19, which is to "avoid[] repeated lawsuits on the same essential subject matter." Fed R. Civ. P. 19 Advisory Comment.

RJA Capital's interests may also be adversely affected by developments in this case without an opportunity to defend itself in the first instance. Given the realities of the situation, it is Plaintiff Magellan's burden to demonstrate why RJA should not be joined. *See Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 478 (6th Cir. 1972) (Tuttle, J., sitting by designation) (where facts indicate the absence of a necessary party, the plaintiff must justify that party's absence). "A failure to meet this burden results in the necessity of either joinder or dismissal." *Id*.

RJA Capital apparently cannot be joined for lack of personal jurisdiction. RJA Capital is an Erie County, New York-based company with no known contacts with Georgia other than the minimal contacts involved in the transaction with

Plaintiff Magellan.  *See* March Aff., **Ex. A**, ¶ 7.   In that event, dismissal is proper

under the Rule 19(b) factors:

- ***First***, "a district court may refuse to proceed with the action if prejudice would result to either the absent party or to parties already joined." *Doty v. St. Mary Parish Land Co.*, 598 F.2d 885, 887 (5th Cir. 1979).  As described above, DMP and RJA Capital may be prejudiced in the absence of joinder; only Plaintiff Magellan might benefit.  This factor favors dismissal.

- ***Second***, "it is difficult to conceive of a method by which [any] relief given in this case could be tailored to avoid prejudice." *Doty*, 598 F.2d at 887.  The DMP Defendants' ability to defend themselves will be compromised, and RJA Capital may be subject, in practical or legal terms, to adverse rulings in this action without the ability to influence those rulings.  This factor favors dismissal.

- ***Third***, any judgment rendered in the absence of RJA Capital will not be "adequate"; instead, it will "only mark[] the beginning of litigation." *Doty*, 598 F.2d at 888.  If Plaintiff Magellan prevails as against DMP, DMP will be forced to proceed against RJA Capital.  If Plaintiff Magellan fails here, it will no doubt seek a second bite at the apple against RJA Capital.  This factor favors dismissal.

- ***Fourth***, there is an adequate forum in which "complete relief [may] be afforded among all the parties." *Doty*, 598 F.2d at 888.  That is the Western District of New York, where the DMP Defendants and RJA Capital are subject to personal jurisdiction, and many of the key witnesses and documents are located.   This factor favors dismissal or transfer to the Western District of New York.

Rule 19 dismissal is common where a "primary participant" in the

underlying incident is absent and cannot be joined.  *Freeman v. Nw. Acceptance*

*Corp.*, 754 F.2d 553, 559 (5th Cir. 1985); *see also, e.g., Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843 (11th Cir. 1999) (affirming Rule 19 dismissal because of need to join alleged member of antitrust conspiracy); *Doty*, 598 F.2d at 888 (holding Rule 19 dismissal "inescapable" because of need to join all parties with potential claims to property); *Schutten v. Shell Oil Co.*, 421 F.2d 869 (5th Cir. 1970) (affirming Rule 19 dismissal because of need to join all putative owners of property).

Dismissal is particularly appropriate where the absent entity is a contract counter-party.  *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Rite Aid of S. Carolina, Inc.*, 210 F.3d 246, 247 (4th Cir. 2000); *H.D. Corp. of Puerto Rico v. Ford Motor Co.*, 791 F.2d 987 (1st Cir. 1986); *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75 (2d Cir. 1984) (noting that absent party's contract rights were "inextricably intertwined" with those of the joined parties); *Acton Corp. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76 (1st Cir. 1982).  The Court should hold likewise in this case and dismiss the Amended Complaint absent joinder of RJA Capital.

The *Challenge Homes* case on which Magellan chiefly relies, while ignoring the foregoing body of law, undercuts Magellan's argument.  There, the Eleventh

Circuit explained that "pragmatic concerns, especially the effect on the parties and the litigation"—not hyper-technical notions of res judicata—drive the Rule 19 analysis. *Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982). In other words, Rule 19 looks to "practical" effects. *Id*. at 670. On that view, the *Challenge Homes* Court declined to order joinder primarily because the absent party, unlike RJA Capital in this case, had "absolutely no interest in the subject matter of the suit." *Id*. at 670-671. In doing so, the Court embraced the body of law on which the DMP Defendants rely, in which contract counter-parties and others with possible rights in the subject matter are indispensable.

Accordingly, the Court should dismiss or transfer the Amended Complaint under Rule 19 for failure to join RJA Capital.

### III.     Plaintiff's Complaint Fails to State a Plausible Claim for Relief.

On the merits, Plaintiff Magellan's bare-bones Amended Complaint fails to state a claim even after amendment.

### a.  Plaintiff Does Not State a Claim for Breach of Contract.

The problem begins with the core claim for breach of contract (Count I), upon which the rest of Magellan's case depends. To withstand a motion to dismiss

17

on a breach of contract claim, a plaintiff must specifically "identify what provisions were breached or provide factual allegations about the terms of the [contract]." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F. Supp. 2d 587, 603 (N.D. Tex. 2014). Without a precise articulation of the terms—key to any contract claim—"plaintiffs fail[] to allege enough facts about the terms of the [contract] to raise their right to relief above the speculative level." *Id.*

The Amended Complaint lacks any meaningful detail about the precise terms of the parties' agreement. Plaintiff Magellan refers to some amorphous right and title to collect the debt, but that is merely a legal characterization and therefore insufficient. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (courts must disregard "allegations in the complaint that are merely legal conclusions").

Like any contract, the devil is in the details, which are absent here. Courts routinely reject such vague and generic pleadings. *See, e.g.*, *Innova Hosp. San Antonio, L.P.*, 995 F. Supp. 2d at 603 (collecting cases); *Garrison v. Select Portfolio Servicing, Inc.*, No. 14-337, 2014 WL 4187202, at * 5 (W.D. Tex. Aug. 1, 2014) (dismissing breach of contract claim where plaintiff did not "identify

what provisions were breached or provide factual allegations about the terms"); *Midwest Special Surgery, P.C. v. Anthem Ins. Cos.*, No. 9-646, 2010 WL 716105, at * 6 (E.D. Mo. Feb. 24, 2010) (dismissing breach of contract claims that "failed to identify the[] contracts with sufficient specificity").

This ambiguity is heightened by the purported breach allegations, which do not line up with the purported term at issue. According to the leading allegation, undefined "information" was "misidentified"—but Magellan nowhere pleads a contract term relating to the identification of unspecified information. Am. Compl. ¶ 28. There can be no breach of a term that did not exist, and there can be no plausible claim that fails to specify which information was "misidentified."

The remaining allegations, stripped of legal characterizations, indicate that Magellan was simply dissatisfied with the quality of the non-performing debt it acquired. Magellan emphasizes that someone—without specifying who—believes the debt was "uncollectible," and some consumers were not aware of the "Evergreen" label by which the industry Parties here refer to the debt. Am. Compl. ¶¶ 16; 32. The gist is that the debt would be difficult to collect, but that is exactly why Plaintiff Magellan could acquire millions of dollars in face value debt for four cents on the dollar. No "industry leading" debt buyer could possibly

believe they were acquiring perfectly collectible debt at that price.  Further, the Amended Complaint does not allege that the DMP Defendants made any representations as to how easily Magellan could profit on this debt.

In fact, the "Bill of Sale" that Magellan drafted and urged DMP to sign specifically disclaims any "representation of, or warranty of collectability."  Am. Compl. Ex. B at 22-23.  The only purported exception is for any unspecified warranties contained in an "Accounts Receivables Purchase Agreement," which Magellan does not rely on because no such document exists.  *See id*.; *see also* March Aff., **Ex. A**, 6.  Thus, Magellan's own document and complaint exhibit—the Bill of Sale—precludes any claims based on the purported collectability of the debt.  *Cf. Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010) (rejecting claims where the documents at issue informed the plaintiff what the bargain would entail).

The Amended Complaint contains a bare assertion that some unspecified number of the accounts had already been collected, but that too is fatally inconsistent with the express disclaimer of collectability in Magellan's own Bill of Sale.  Moreover, the Amended Complaint provides no factual support for this allegation and does not define the scope of the problem within a portfolio of

thousands of accounts.  This too leaves one guessing about what exactly the

allegation is.  It would not be unheard of for some debtors to claim that they

already paid their charged-off accounts, which Magellan obviously knows.  To the

extent the allegation is not fatally inconsistent with Magellan's own document, it is

simply an "unadorned, the-defendant-unlawfully-harmed-me accusation," which is

insufficient to show an entitlement to relief.  *Ashcroft v. Iqbal*, 566 U.S. 662, 678

(2009).

Plaintiff Magellan's other exhibits to the Amended Complaint only increase

the ambiguity.  Exhibit C to the Amended Complaint contains an email string that

is the purported linchpin of Magellan's case.  It suggests that a third party called

National Credit Adjusters, LLC ("NCA") analyzed certain debt files called BMG

and Evergreen (apparently not just the Evergreen debt at issue here), and found a

match between some *consumers* for whom NCA owned debt at some point and

some *consumers* for whom Magellan owned debt at some point.  Am. Compl. Ex.

C at 25; 27-28.  NCA compared partial account numbers, not complete account

numbers, and matched individuals—not necessarily specific accounts.  Am.

Compl. Ex. B. at 27 (explaining how NCA subtracted "the last three digits" of

account numbers and used social security numbers to match individuals in

Magellan's file to "a BMG account"); *see also* Valentine Aff., Ex. B, ¶ 12

(explaining how NCA's analysis could not match specific debt files to specific

debt files).  In fact, NCA explained this to Magellan: "FYI – In some cases we

may have multiple BMG accounts for the same consumer. . . . Example:

[consumer] returned our account id **5698**509 in the match up, but she also has

account id **5698**511." Am. Compl. Ex. B. at 28 (emphasis added to illustrate how

the final account numbers differ for an individual).  Individual consumer matches

like this are unsurprising because consumers who carry this kind of debt routinely

take out a series of small loans.  Valentine Aff., Ex. B., ¶ 12.  Here again, Plaintiff

Magellan's own documents belie its allegations.

Moreover, if the Amended Complaint is somehow alleging that NCA owned

some of the same debt files at some other point in time, it would be unsurprising.

By definition this is charged-off debt that has been bought and sold before.  Nor is

there any allegation that the DMP Defendants represented that the debt had never

been sold before.

Further undercutting Magellan's claims, the Amended Complaint implies

that half of the purported February purchase, which Plaintiff Magellan re-sold to

another party, was unproblematic.  Apparently, approximately $2 million of that

debt is "not involved with this litigation."  Am. Compl. ¶ 15 n.1; *see also* Valentine Aff., **Ex. B**, ¶ 11 (explaining that Magellan never complained about portions of the debt at issue because they were likely successfully collected).  It is inconceivable that half of a spreadsheet could be problem-free while the other half supports fraud and breach claims.

Stripped to its factual core, the essence of the Amended Complaint is that Magellan is dissatisfied with its profit margin.  That is a business risk inherent in a risky industry, not a lawsuit.  Magellan's contract-based claim fails.

### b.  Plaintiff Does Not State a Claim for Fraud.

Magellan's fraud-based claims in Counts II and III rest on the same flawed theory of unspecified breach and disregard for Magellan's own documents.  Moreover, even if Magellan barely asserted a contract claim (which it did not), the vague allegations in Counts II and III fall well short of laying out a fraud claim in meaningful detail under Rule 9(b), which requires that the circumstances constituting fraud must be stated with particularity.  *RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275, 1298 (N.D.Ga. 2013).

"A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the

statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." *In re Theragenics Corp. Sec. Litig.,* 105 F.Supp. 2d 1342, 1347 (N.D.Ga. 2000) (citing *Brooks v. Blue Cross and Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997)).  These detailed requirements guard against the kind of "spurious charges of immoral and fraudulent behavior" that Magellan throws about so casually.  *United States ex rel. Clausen v. Lab. Corp. of America, Inc.,* 290 F. 3d 1301, 1310 (11th Cir. 2002).

Although the Amended Complaint refers to a telephone call and a face-to-face meeting in Florida, the substantive allegations continue to offer nothing more than legal characterizations and vague allegations that do not plausibly outline a claim for fraud.  At most, Magellan has outlined a small amount of "when," but not the "what," "how," and "why" required to state a claim for fraud.  Counts II and III should be dismissed.

Further, as explained above, the putative contract at issue precludes a plausible allegation of reasonable reliance.  In the *American Dental Association* case, for example, the Eleventh Circuit recognized that a complaint could not state a fraud claim where the underlying documents informed the plaintiff about the

purportedly misleading information.  605 F.3d at 1292.  So too here.  Magellan's Bill of Sale disclaims any warranties as to collectability.  Magellan cannot plausibly claim to have been misled about the collectability of risky debt when its own Bill of Sale disavows any such representation.

Magellan's fraud-based claims should be dismissed as under-alleged and implausible.

### c.  Plaintiff Does Not State a Georgia RICO Claim.

Magellan's Georgia RICO claim (Count IV) is even more deficient.  As an initial matter, Magellan cannot show that it was the victim of fraud for the reasons set forth above.  Because Magellan cannot show injury from an alleged fraud, Magellan has no RICO claim.  *See* OCGA § 16-14-6 (requiring a showing of misconduct and injury).

Nor does Magellan make out the rest of a RICO claim.  Under the detailed Georgia RICO statute, Magellan was required to make out a plausible showing regarding the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *J.G. Williams, Inc. v. Regency Props.*, Ltd., 672 F. Supp. 1436, 1440, 1442-1443 (N.D. Ga. 1987) (recognizing that the Georgia statute is patterned on the federal statute and federal law is therefore instructive).  Among

other details, a civil RICO plaintiff must "show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290-91 (11th Cir. 2010) (affirming dismissal of vaguely pled RICO allegations); *see also* OCGA § 16-14-3(8) (defining a pattern to require at least two related predicate acts). Further, because Plaintiff's RICO claims sound in fraud, they must be articulated with specificity under Rule 9(b). *Am. Dental Ass'n*, 605 F.3d at 1290.

Plaintiff Magellan makes no attempt to satisfy these detailed requirements. The Georgia RICO claim has only a single purportedly substantive paragraph regarding the necessary predicate act allegations. Paragraph 58 contains no details regarding those allegedly fraudulent predicate acts, the laws allegedly violated, and the requisite jurisdictional nexus. Surely the purportedly affected parties "URG Online and [] other debt purchasers" could not travel on the basis of Paragraph 58. Neither can Magellan for purposes of its RICO claim. The remaining paragraphs are essentially bare legal allegations.

Because Magellan did not adequately plead a Georgia RICO claim, the claim must be dismissed.

**d.** **Plaintiff Does Not State a Claim for Punitive Damages or Attorney's Fees.**

Magellan has not articulated a claim for punitive damages.  The three-paragraph Count V summarily adopts the preceding paragraphs, a practice the Eleventh Circuit has "roundly, repeatedly, and consistently condemn[ed]" because it makes it "virtually impossible" to determine whether plausible factual allegations exist.  *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 112-1126 (11th Cir. 2014) (explaining that such vaguely-pled claims should not go forward).  Then, the Amended Complaint offers only unadorned legal assertions that punitive damages are warranted, which must be disregarded in the *Twombly*/*Iqbal* analysis.  *See* Am. Compl. ¶ 66-67.

Punitive damages would not be available in this action even if Magellan had pled a better claim.  "[P]unitive damages may not be recovered for breach of contract, and even gross negligence is inadequate to support a punitive damages award."  *Puckette v. John Bailey Pontiac-Buick-GMC Truck, Inc.*, 311 Ga. App. 138, 140, 714 S.E.2d 750, 753 (2011).  Magellan thus cannot recover punitive damages under its core breach theory, or for its negligent misrepresentation claim.  Magellan's intentional fraud claim is devoid of factual detail demonstrating the

27

kind of wanton disregard for consequences required to support a punitive damages claim.  In fact, Magellan effectively concedes that it cannot plead such wantonness in good faith, explaining that it resorted to pleading DMP's mental state "generally."  *See* Pls.' Resp. to Defs.' Mot. To Dismiss or Transfer Venue [DE 8] at  18-19.

Magellan's stubborn litigiousness claim for attorney's fees is even more summary.  It consists of only two paragraphs:  a vague adoption paragraph and a bare legal conclusion, neither of which can establish a plausible claim for relief as a matter of law.  *See* Am. Compl. 68-69.  Moreover, stubborn litigiousness damages are only available when the defendant openly concedes liability and damages and effectively says "so sue me."  *Horton v. Dennis*, 325 Ga. App. 212, 215, 750 S.E.2d 493, 496 (2013).  Magellan's Amended Complaint contains no plausible factual allegations demonstrating anything of the kind.  There are clearly "bona fide dispute[s]" of fact and law in this case, which preclude stubborn litigiousness damages as a matter of law.  *Horton*, 325 Ga. App. At 217, 750 S.E.2d at 497-98; *Macon-Bibb Cnty Water & Sewerage Auth. v. Tuttle/White Constructors, Inc.*, 530 F. Supp. 1048, 1059 (M.D. Ga. 1981).  Moreover, those claims are merely derivative of Plaintiff's substantive claims and must be

dismissed along with them. *See Quantum Trading Corp. v. Forum Realty Corp.*, 278 Ga. App. 485, 490, 629 S.E.2d 420, 424 (2006).

## IV. To the Extent This Case Goes Forward, the Court Should Transfer the Case to the Western District of New York.

To the extent this case goes forward at all, it belongs in New York, not in Georgia. At a basic level, this case is about alleged representations in Florida, contracts involving mostly New York-based firms and non-Georgia debt, and witnesses who are mostly everywhere but Georgia. Whether or not venue is proper in this District under 28 U.S.C. § 1391(b), the factors governing transfer of venue under 28 U.S.C. § 1404(a) favor venue in New York.

Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *See also Ramsey v. Fox News Network, LLC*, 323 F. Supp. 2d 1352, 1355 (N.D. Ga. 2004).

The Eleventh Circuit has stated that the factors a district court should apply when evaluating whether to transfer a case under § 1404(a) include: "(1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4)

the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

Transfer to the Western District of New York is warranted because (1) the DMP Defendants and the other contract counter-parties reside in New York, have no ties to Georgia, and it will be time-consuming and expensive to require defendants to litigate this action in Georgia; (2) non-party witnesses from DMP as well as any witnesses from non-parties Cuzco (identified by plaintiff in the Complaint) and RJA Capital, Inc., are located in New York; (3) all of DMP's documents and, upon information and belief, Cuzco's and RJA Capital's documents are located in New York; (4) New York courts are equipped to handle this action and New York law may apply; and (5) Magellan has contacts in New York and does business in New York and would not be inconvenienced by a transfer.

In deciding whether the balance of interests favors transfer, "non-party witnesses and 'key witnesses' with information regarding the defendant's liability weigh heavily in the balance." *Ramsey*, 323 F. Supp. 2d at 1356.  There is a "significant judicial preference for live testimony." *Exter Shipping Ltd. v. Kilakos*, 310 F.Supp.2d 1301, 1324 (N.D. Ga. 2004).  And non-party witnesses, who will be critical here, are presumed to be more-likely to testify in their local forum; that "weighs most heavily on the Court in deciding on a motion to transfer venue." *Ramsey*, 323 F. Supp. 2d at 1356.  Additionally, Federal Rule of Civil Procedure 45(b)(2) provides that a subpoena may be served at any place within the district of the issuing court or "outside the district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection."  Live testimony of the witnesses on key issues in this case is therefore more likely if the case is tried in New York.  Not only is transfer favored by the convenience to the non-party witnesses and the availability of their live testimony at trial, it appears that the locus of operative facts is in New York, not Georgia.

Further, New York-based RJA Capital belongs in this case but is likely not subject to personal jurisdiction in Georgia.  Transfer to the Western District of New York will enable this dispute to be resolved in one proceeding, rather than in

piecemeal fashion.  Management of the case, trial efficiency, and the totality of the circumstances all support transfer to the Western District of New York.

## CONCLUSION

For the foregoing reasons, the Court should grant the DMP Defendant's motion to dismiss the complaint, in its entirety.  Alternatively, the Court should transfer this action to the United States District Court for the Western District of New York.

Respectfully submitted this 22nd day of January, 2015.

**ALSTON & BIRD LLP**

/s/ Aaron Karl Block
Theodore B. Eichelberger, Esq.
Georgia Bar No. 242330
Aaron Karl Block, Esq.
Georgia Bar No. 508192
*Counsel for Defendants*
*Debt Management Partners, LLC,*
*Adam March, and Daniel Valentine*
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
phone:      404-881-7000
fax:          404-881-7777
Ted.Eichelberger@alston.com
Aaron.Block@alston.com

Gerald Walsh, Esq.
David Gutowski, Esq.
Zdarsky, Sawicki & Agostinelli
404 Cathedral Place
298 Main Street
Buffalo, NY 14202
phone:  (716) 855-3200
fax:      (716) 855-3101
gtwalsh@zsa.cc
dgutowski@zsa.cc
*Counsel for Defendants*
*Debt Management Partners, LLC,*
*Adam March, and Daniel Valentine*

TO:   **KNIGHT JOHNSON LLC**
Brian M. Knight, Esq.
Sherri G. Buda, Esq.
*Attorneys for Plaintiff*
1360 Peachtree Street, Suite 1201
Atlanta, Georgia 30309
phone: 404-228-4822
bknight@knightjohnson.com
Sbuda@knightjohnson.com

## <u>CERTIFICATE OF FONT COMPLIANCE</u>

 Counsel for the Defendants hereby certifies that **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TRANSFER AS TO PLAINTIFF MAGELLAN'S AMENDED COMPLAINT** has been prepared with one of the font and point selections approved by the Court in LR 5.1(C): Times New Roman (14 point).

**ALSTON & BIRD LLP**

/s/ Aaron Karl Block
Theodore B. Eichelberger, Esq.
Georgia Bar No. 242330
Aaron Karl Block, Esq.
Georgia Bar No. 508192
*Counsel for Defendants*
*Debt Management Partners, LLC,*
*Adam March, and Daniel Valentine*
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
phone:     404-881-7000
fax:       404-881-7777
Ted.Eichelberger@alston.com
Aaron.Block@alston.com

TO: **KNIGHT JOHNSON LLC**
Brian M. Knight, Esq.
Sherri G. Buda, Esq.
*Attorneys for Plaintiff*

1360 Peachtree Street
Suite 1201
Atlanta, Georgia 30309
bknight@knightjohnson.com
Sbuda@knightjohnson.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 22nd day of January, 2015, I electronically filed **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TRANSFER AS TO PLAINTIFF MAGELLAN'S AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:


TO:  **KNIGHT JOHNSON LLC**
Brian M. Knight, Esq.
Sherri G. Buda, Esq.
*Attorneys for Plaintiff*
1360 Peachtree Street
Suite 1201
Atlanta, Georgia 30309
bknight@knightjohnson.com
Sbuda@knightjohnson.com


                                              /s/ Aaron Karl Block