# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**MAGELLAN TRADING COMPANY, LLC,**

                    Plaintiff,

                                        Case No.: 1:14-CV-03928-MHC

v.

**DEBT MANAGEMENT PARTNERS, LLC,
ADAM MARCH AND DANIEL VALENTINE,**

                    Defendants.

STATE OF NEW YORK   )
                                    ) ss:
COUNTY OF ERIE        )

ADAM MARCH, being duly sworn, deposes and says:

1.      I am an officer of Debt Management Partners LLC ("DMP"), and have been named as a defendant along with DMP and Daniel Valentine in the above referenced action.  As such, I am fully familiar with the facts and circumstances set forth herein.

2.      I make this affidavit in support of defendants' motion to dismiss this action for lack of personal jurisdiction, failure to join an indispensable party, improper venue, and failure to plead a cause of action.  In the alternative, defendants ask the Court to transfer the proceeding to the Western District of New York.

3.      DMP is a Delaware Limited Liability Company that maintains its office at 200 John James Audubon Parkway, Suite 102, Amherst, Erie County, New York.  DMP is a wholly owned subsidiary of Valmar Holdings, Inc., which is a New York business corporation.  I am a 50% shareholder of Valmar Holdings, Inc.  I maintain my sole residence in the Town of Clarence, Erie County, New York.

4.      None of the defendants is a resident or citizen of the State of Georgia, transacts business within the State of Georgia, or owns, uses or possesses real property situated in the State of Georgia.

5.      DMP is in the business of buying and selling non performing accounts receivable. DMP buys and sells charged off accounts receivable through transactions with companies in New York and in several other states.  However, DMP does not maintain any kind of continuous or systematic marketing or other business contact with any companies or individuals in Georgia, and does not derive substantial revenue from Georgia residents.  In fact, DMP has never transacted business in Georgia.  Limited contacts with plaintiff Magellan Trading Company LLC ("Magellan" or "plaintiff") are described below.

6.      From February 25-28, 2014, Dan Valentine and I attended the Community Financial Services of America ("CFSA") conference in Orlando Florida.  The CFSA conference is an annual trade show for consumer lenders.  At that conference, we were approached by Christopher Norman, who we knew to be the principal of Magellan.  Norman asked us about possibly purchasing debt from DMP, and we engaged in discussions over a period of several days while at the conference.  DMP ultimately agreed to sell Magellan approximately $5 million in debt at a 4% purchase price.  No written contract was ever signed, but DMP transferred the account portfolios with a face value of $5,000,022 to Magellan electronically, and Magellan wired DMP the purchase price of $200,000.88 on March 6, 2014.  This was the only debt sale ever completed between DMP and Magellan, and it was based entirely upon conversations between and among Chris Norman, Dan Valentine, and me while we attended the CFSA conference in Orlando Florida.

7.      In its amended complaint, Magellan references a deal in February 2014 in which Magellan allegedly purchased $3,999,372 in debt in a transaction "in which DMP acted as the broker". This is not true. Upon information and belief, Magellan purchased that debt from another New York corporation named RJA Capital, Inc. ("RJA"). DMP did sell debt to RJA for $120,000 on February 20, 2014. However, there was no transaction between DMP and Magellan, and DMP received no fee from Magellan in February 2014. DMP did not act as a broker on any Magellan transaction, and received no broker's fee, in February 2014, or at any other time.

8.      None of the debt sold to Magellan by DMP in March, 2014 was owed by Georgia residents. Also, none of the debt sold to RJA on February 20, 2014, which was apparently resold by RJA to Magellan, was owed by Georgia residents.

9.      Magellan also alleges in its amended complaint that it resold a portion of the debt it purchased from RJA (the so-called "February Purchase"), and all of the debt it purchased from DMP (the so-called "March Purchase"), to a company called Cuzco Capital Investment Management, LLC ("Cuzco"). According to records maintained by the New York State Department of State, Cuzco is a Delaware Limited Liability Company authorized to do business in New York with its residence designated as Albany County, New York. Magellan alleges in its amended complaint that Cuzco had problems collecting on the debt purchased from DMP (and at least some of the debt purchased from RJA). However, Cuzco, upon information and belief, indicated to third parties that it had no problems or concerns related to any of the DMP or RJA debt.

-3-

10.   On March 7, 2014, Norman emailed three documents, that he apparently drafted, each entitled "Bill of Sale".  He followed up with an email on March 10, 2014 asking DMP to sign and return the documents.  Although the "Bills of Sale" were inaccurate in several respects, I signed and returned them on March 11, 2014.  This was a mistake.  First,  the Norman-drafted documents each reference an "Accounts Receivables Purchase Agreement".  No such agreement was ever signed by DMP on a transaction with Magellan.  Second, the "Bills of Sale" that reference February 20 and 21, 2014 transactions between Magellan and DMP are also incorrect. As discussed above, Magellan purchased debt in February from RJA, not DMP.

11.   Later in March 2014, Norman called DMP claiming that there were problems with the debt he had purchased.   Mr. Valentine and I spoke with him on the phone in March and April, 2014, and met with him in person when Norman came to Buffalo, New York on April 18, 2014, to discuss the alleged problems with the debt.  Specifically, Magellan claimed that Cuzco could not effectively collect on the debt because collectors could not identify the originating lender.  DMP offered to provide Magellan (and, in turn, Cuzco) with information to identify the originating lender on each of the accounts.  Magellan also raised the prospect of selling some portion of certain debt it owned to DMP.  Magellan never responded to DMP's offer to provide additional information, and never followed up on its own proposed buy-back until months later when it threatened litigation and delivered an ultimatum through its attorney.

12.   In January or February 2014, DMP sent Magellan an account portfolio that RJA had purchased from DMP and re-sold to Magellan.  DMP received no fee for doing this.  It was simply an accommodation to RJA.  Dan Valentine emailed a link to the portfolio and copied RJA's principal, Anthony Coppola, on the email.  Coppola circulated some emails during this

-4-

time period that were addressed or copied to DMP and Magellan, but there was no transaction between DMP and Magellan at the time.

13.   In or about August 2013, Norman contacted me to talk about Magellan possibly purchasing debt from DMP.  Our communications consisted of a few emails and telephone calls.  I never traveled to Georgia and neither did Mr. Valentine.  In contemplation of a possible deal, DMP signed a non-disclosure agreement, drafted by Magellan, to protect any confidential or proprietary information which might be exchanged by the parties in any subsequent transaction.  However, there was no transaction between DMP and Magellan until the March 6, 2014 sale discussed above.

14.   In April and May 2011, Norman solicited DMP by telephone and/or email to broker debt sales by DMP to RJA and another New York Company, called Solidus.  In my December 2014 Affidavit, I mistakenly stated that it was Magellan that came to DMP in 2011, but Norman has since indicated that Magellan did not join until 2013.  DMP paid Norman individually two broker fees of $1500 each.  In June 2011, Norman contacted DMP and demanded additional broker fees because DMP had done subsequent deals with RJA and Solidus.  Even though Norman took no part in those deals, DMP paid another $1500, as a "broker fee" to him in June, 2011.

15.   Any and all communications I have ever had with Mr. Norman have been on behalf of DMP.  I have never engaged in any transactions with Mr. Norman or Magellan in my own individual capacity.

16.   I have not personally engaged in any business in Georgia.  I did attend a conference in Atlanta for two days and nights in June 2014 for another business, but that is the sum total of my contacts with the State.

-5-

17.      Based upon the foregoing, I respectfully request that the Court grant the

defendants' motion to dismiss.

_____

Adam March

Sworn to before me this
22nd day of January, 2015

(notary public)

ANDREA EPOLITO
No. 01EP6138082
Notary Public, State of New York
Qualified in Erie County
My Commission Expires Dec. 12, 20 17

-6-