# Exhibit B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**MAGELLAN TRADING COMPANY, LLC,**

        Plaintiff,

                                    Case No.: 1:14-CV-03928-MHC

v.

**DEBT MANAGEMENT PARTNERS, LLC,**
**ADAM MARCH AND DANIEL VALENTINE,**

        Defendants.

STATE OF NEW YORK   )
                           ) ss:
COUNTY OF ERIE       )

      DANIEL VALENTINE, being duly sworn, deposes and says:

      1.      I am an officer of Debt Management Partners LLC ("DMP"), and have been named as a defendant along with DMP and Adam March in the above referenced action. As such, I am fully familiar with the facts and circumstances set forth herein.

      2.      I make this affidavit in support of defendants' motion to dismiss this action for lack of personal jurisdiction, failure to join an indispensable party, and improper venue, and failure to plead a cause of action. In the alternative, defendants ask the Court to transfer the proceeding to the Western District of New York.

      3.      DMP is a Delaware Limited Liability Company that maintains its office at 200 John James Audubon Parkway, Suite 102, Town of Amherst, Erie County, New York. DMP is a wholly owned subsidiary of Valmar Holdings, Inc., which is a New York business corporation. I am a 50% shareholder of Valmar Holdings, Inc. I maintain my sole residence in the Town of Clarence, Erie County, New York.

4. None of the defendants is a resident or citizen of the State of Georgia, transacts business within the State of Georgia, or owns, uses or possesses real property situated in the State of Georgia.

5. DMP is in the business of buying and selling non performing accounts receivable. DMP typically purchases the right to collect on portfolios of loan accounts that are charged off by the original lenders as uncollectable after the debtor fails to pay the loan. Some of the products that DMP specializes in are short-term loans of relatively small amounts to sub-prime borrowers. DMP typically pays a few cents on the dollar in relation to the face value of the debts and then either outsources or resells portfolios of accounts at a negotiated purchase price to other companies that, in turn, resell or try to collect on them. DMP buys and sells debt through transactions with companies in New York and in several other states. However, DMP does not maintain any kind of continuous or systematic marketing or other business contact with any companies or individuals in Georgia, and does not derive substantial revenue from Georgia residents. In fact, DMP has never transacted business in Georgia. Limited contacts with plaintiff Magellan Trading Company, LLC ("Magellan" or "plaintiff") are described below.

6. From February 25-28, 2014, Adam March and I attended the Community Financial Services of America ("CFSA") conference in Orlando Florida. The CFSA conference is an annual trade show for consumer lenders. At that conference, we were approached by Christopher Norman, who we knew to be the principal of Magellan. Norman asked us about possibly purchasing debt from DMP, and we engaged in discussions over a period of several days while at the conference. DMP ultimately agreed to sell Magellan approximately $5 million in debt at a 4% purchase price. No written contract was ever signed, but DMP transferred the account portfolios with a face value of $5,000,022 to Magellan electronically, and Magellan

wired DMP the purchase price of $200,000.88 on March 6, 2014.  The negotiated purchase price reflected the value of the debt in relation to its collectability.  However, DMP does not, and did not in this transaction give any warranty of collectability.  This was the only debt sale ever completed between DMP and Magellan, and it was based entirely upon conversations between and among Chris Norman, Adam March, and myself while we attended the CFSA conference in Orlando Florida.

7. In its amended complaint, Magellan references a deal in February 2014 in which Magellan allegedly purchased $3,999,372 in debt in a transaction "in which DMP acted as the broker".  This is not true.  Upon information and belief, Magellan purchased that debt from another New York corporation named RJA Capital, Inc. ("RJA").  DMP did sell debt to RJA for $120,000 on February 20, 2014.  However, there was no transaction between DMP and Magellan, and DMP received no fee from Magellan in February 2014.  DMP did not act as a broker on any Magellan transaction, and received no broker's fee, in February 2014, or at any other time.  In fact, I had no telephone contact with anyone at Magellan between January 21 and February 20, 2014.

8. None of the debt sold to Magellan by DMP in March, 2014 was owed by Georgia residents.  Also, none of the debt sold to RJA on February 20, 2014, which was apparently resold by RJA to Magellan, was owed by Georgia residents.

9. Magellan also alleges in its amended complaint that it resold a portion of the debt it purchased from RJA (the so-called "February Purchase"), and all of the debt it purchased from DMP (the so-called "March Purchase"), to a company called Cuzco Capital Investment Management, LLC ("Cuzco").  According to records maintained by the New York State Department of State, Cuzco is a Delaware Limited Liability Company authorized to do business

in New York with its residence designated as Albany County, New York. Magellan alleges in its amended complaint that Cuzco had problems collecting on the debt purchased from DMP (and at least some of the debt purchased from RJA). However, Cuzco, upon information and belief, indicated to third parties that it had no problems or concerns related to any of the DMP or RJA debt. Copies of Entity Information printouts from the New York Secretary of State website for RJA and Cuzco are attached as **Exhibits A and B**, respectively.

10. On March 7, 2014, Norman emailed DMP three documents, that he apparently drafted, each entitled "Bill of Sale". He followed up with an email on March 10, 2014 asking DMP to sign and return the documents. Although the "Bills of Sale" were inaccurate in several respects, Adam March signed and returned them on March 11, 2014. This was a mistake. First, the Norman-drafted documents each reference an "Accounts Receivables Purchase Agreement". No such agreement was ever signed by DMP on a transaction with Magellan. Second, the "Bills of Sale" that reference February 20 and 21, 2014 transactions between Magellan and DMP are also incorrect. As discussed above, Magellan purchased debt in February from RJA, not DMP. In any event, the bills of sale relied upon by Magellan and attached to the amended complaint expressly disclaim any warranty of collectability.

11. Later in March 2014, Norman called DMP claiming that there were problems with the debt he had purchased. Mr. March and I spoke with him on the phone in March and April, 2014, and met with him in person when Norman came to Buffalo, New York on April 18, 2014, to discuss the alleged problems with the debt. Magellan now concedes that there were no problems with approximately $2,000,000.00 of the debt re-sold to Magellan by RJA. However, Magellan claimed that Cuzco could not effectively collect on the rest of the debt it had purchased because collectors could not identify the originating lender. DMP offered to provide Magellan

(and, in turn, Cuzco) with information to identify the originating lender on each of the accounts. Magellan also raised the prospect of selling some portion of certain debt it owned to DMP. Magellan never asked DMP to purchase all of the debt from the February-RJA and March-DMP transactions. This is likely because Cuzco or some other company successfully collected on those accounts. Upon information and belief, Magellan was simply trying to earn a better return by selling back the accounts its client could not successfully collect at the original price. In any event, Magellan never responded to DMP's offer to provide additional information, and never followed up on its own proposed buy-back until months later when it threatened litigation and delivered an ultimatum through its attorney.

12. In its Amended Complaint, Magellan alleges that DMP intentionally, "double-sold" accounts based on an alleged "analysis" by a company called NCA. However, the NCA methodology described in the amended complaint (Exhibit C) does not substantiate this claim. That methodology apparently consisted of searching NCA portfolios for matches of lender account numbers <u>minus the last three digits</u> against the last four digits of debtor social security numbers in order to determine if the same accounts purchased by Magellan were also purchased by NCA. The fact that matches were found proves nothing. It is not uncommon for debtors to take multiple loans, one after another, with the same lender. Although the account numbers for that borrower might have the same prefix, the last three digits would likely designate different accounts. Only where entire lender account numbers, along with balance, open date and delinquency date matched could the accounts be the same.

13. With the exception of the March 6, 2014 transaction, DMP never completed a deal with Magellan. In or about February 2014, at RJA's direction, DMP copied Magellan on the email containing a link to download and open a sale file that RJA had bought from DMP.

Upon information and belief, RJA had resold that portfolio to Magellan. DMP received no fee of any kind from the February transaction between Magellan and RJA, and copied Magellan on the email at the request of RJA.

14. In or about August 2013, Norman contacted Mr. March to talk about Magellan possibly purchasing debt from DMP. Communications consisted of a few phone calls and emails. Neither Mr. March nor I ever traveled to Georgia. In contemplation of a possible deal, DMP signed a non-disclosure agreement, drafted by Magellan, to protect any confidential or proprietary information which might be exchanged by the parties in any subsequent transaction. However, there was no transaction between DMP and Magellan until the March 6, 2014 sale discussed above.

15. In April and May 2011, Chris Norman solicited DMP by telephone and/or email to broker debt sales by DMP to RJA and another New York Company, called Solidus. My 2014 Affidavit mistakenly stated that it was Magellan that came to DMP regarding RJA and Solidus. However, Norman has since indicated that he did not join Magellan until 2013. DMP paid Norman, individually, two broker fees of $1500 each. In June 2011, Norman contacted DMP and demanded additional broker fees because DMP had done subsequent deals with RJA and Solidus. Even though Norman took no part in those deals, DMP paid another $1500, as a "broker fee" to Norman in June, 2011.

16. Finally, the amended complaint alleges that DMP "completed multiple sales of the same debts" to companies identified as URG Online and to "other debt purchasers through brokers affiliated with Big Sky Research and Phoenix Asset Group". DMP never sold debt to URG or Phoenix, and I have never heard of them. DMP did sell debt to Big Sky in March of

2014. After DMP provided additional lender information like it offered to plaintiff, Big Sky never expressed any complaints about the transactions.

17. Any and all communications I have ever had with Mr. Norman have been on behalf of DMP. I have never engaged in any transactions with Mr. Norman or Magellan in my individual capacity.

18. I have not personally transacted any business in Georgia. In fact, I have only driven through Georgia a few times in my life and have had lay overs at the Atlanta airport, but have never even spent the night there.

19. Based upon the foregoing, I respectfully request that the Court grant the defendants' motion to dismiss.

_____
Daniel J. Valentine

Sworn to before me this
22nd day of January, 2015

_____
(notary public)

ANDREA EPOLITO
No. 01EP6138082
Notary Public, State of New York
Qualified in Erie County
My Commission Expires Dec. 12, 20 17

# EXHIBIT A

# NYS Department of State

## Division of Corporations

## Entity Information

The information contained in this database is current through December 1, 2014.

Selected Entity Name: RJA CAPITAL, INC.
Selected Entity Status Information

**Current Entity Name:** RJA CAPITAL, INC.
**DOS ID #:** 3887464
**Initial DOS Filing Date:** DECEMBER 10, 2009
**County:** ERIE
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information
**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
RJA CAPITAL, INC.
475 ELLICOTT STREET,
APT 401
BUFFALO, NEW YORK, 14203

**Chief Executive Officer**
ANTHONY COPPOLA
461 ELLICOTT ST
BUFFALO, NEW YORK, 14203

**Principal Executive Office**
RJA CAPITAL, INC.
461 ELLICOTT ST
BUFFALO, NEW YORK, 14203

**Registered Agent**

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 20, 2012 | Actual | RJA CAPITAL, INC. |
| DEC 10, 2009 | Actual | ROBERT JAMES & ASSOCIATES, INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us

# EXHIBIT B

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through December 16, 2014.

      Selected Entity Name: CUZCO CAPITAL INVESTMENT MANAGEMENT, LLC
      Selected Entity Status Information
**Current Entity Name:** CUZCO CAPITAL INVESTMENT MANAGEMENT, LLC
**DOS ID #:** 3816795
**Initial DOS Filing Date:** JUNE 01, 2009
**County:** ALBANY
**Jurisdiction:** DELAWARE
**Entity Type:** FOREIGN LIMITED LIABILITY COMPANY
**Current Entity Status:** ACTIVE

      Selected Entity Address Information
**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O NATIONAL REGISTERED AGENTS INC
875 AVENUE OF THE AMERICAS
SUITE 501
NEW YORK, NEW YORK, 10001
      **Registered Agent**
NONE

      This office does not require or maintain information regarding the names and addresses of members or managers of nonprofessional limited liability companies. Professional limited liability companies must include the name(s) and address(es) of the original members, however this

information is not recorded and only available by
viewing the certificate.

### *Stock Information

**# of Shares**    **Type of Stock**    **$ Value per Share**

No Information Available

*Stock information is applicable to domestic business corporations.

### Name History

**Filing Date**  **Name Type**         **Entity Name**
JUN 01, 2009     Actual                CUZCO CAPITAL INVESTMENT MANAGEMENT, LLC

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs | Privacy Policy | Accessibility Policy | Disclaimer | Return to DOS Homepage | Contact Us