IN THE UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAGELLAN TRADING COMPANY, LLC,

      Plaintiff,

v.

DEBT MANAGEMENT PARTNERS, LLC, ADAM MARCH, and DANIEL VALENTINE,

      Defendants.

Civil Action File
No: 1:14-CV-03928-MHC

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE AS TO PLAINTIFF'S AMENDED COMPLAINT

COMES NOW Magellan Trading Company, LLC ("Magellan") and files this response to Defendants' Motion to Dismiss or Transfer Venue as to Plaintiff Magellan's Amended Complaint, respectfully showing the Court as follows:

## I. INTRODUCTION

In 2014, Plaintiff Magellan and Defendant Debt Management Partners, LLC ("DMP") completed two transactions in which DMP sold certain accounts receivable debt to Magellan. Before Magellan purchased the debt, Defendants represented to Magellan that it would receive all rights, title, and all interest in the debt, including the exclusive right to collect the debt. However, within days after the parties

completed the second transaction, Magellan learned that the debt it purchased from DMP had previously been sold to another buyer such that Magellan did not receive exclusive rights to the debt.

Magellan presented evidence of the previous sale to Defendants. Despite being presented with evidence that DMP breached its agreements, Defendants refused to refund the amount Magellan paid for the debt or to otherwise resolve the matter reasonably.  Moreover, Magellan has since learned that DMP made similar duplicate sales to other buyers.

Defendants have filed a motion to dismiss in which they toss out multiple grounds for dismissing Magellan's Amended Complaint to see if any will stick. None do. Defendants argue this matter should be dismissed because the Court lacks personal jurisdiction over Defendants, because Magellan failed to join an indispensible party, because Magellan failed to state a plausible claim, and because venue is not proper in this Court.  Each of these arguments fails.

First, this Court may exercise personal jurisdiction over Defendants.  Magellan is a Georgia company, and its principals are Georgia residents.  For the last four years, Defendants have enjoyed an ongoing relationship with Magellan and its principals in which the parties worked together on multiple transactions, including the transactions at issue in this litigation.  Such contacts support personal jurisdiction

under the Georgia long-arm statute and the United States Constitution.

Second, Magellan has not failed to join a required party.  Defendants contend that RJA Capital ("RJA") is required because Defendants may seek indemnification from RJA.  However, Eleventh Circuit law is clear that a party is not required merely because a defendant may seek indemnification from it.  Moreover, even if RJA is required, the proper remedy is joinder, not dismissal.

Third, Magellan has stated plausible claims for relief. As shown below, the factual allegations in the Amended Complaint support Magellan's claims, and Defendants have not raised any defense that would bar those well-pleaded claims. Therefore, Defendants have failed to show why Magellan's claims should be dismissed pursuant to Rule 12(b)(6).

Finally, transferring this case to New York would not result in a more convenient forum. This case involves a dispute between a Georgia plaintiff and New York defendants.  Other than the parties and their principals, likely witnesses are scattered across the country.  This Court is as qualified as a New York court to rule on Magellan's breach of contract and fraud claims and likely better able to address its claims for violations of Georgia's RICO Act.  Accordingly, the overall convenience of the parties and witnesses and the interest of justice are well-served by adjudicating this matter in Georgia.

## II.  FACTUAL BACKGROUND

**A.**    **Defendants' Relationship with Magellan**

Magellan and DMP are both in the business of buying and selling non-performing accounts receivables. DMP is a Delaware company with its principal place of business in New York.  (Def.s' Br. [D.E. 14-1], p.2.)  DMP's principals, Adam March ("March") and Daniel Valentine ("Valentine"), reside in New York. [D.E. 14-1, p. 2.]  Magellan is a Georgia company with its principal place of business in this State.  (Am. Compl. [D.E. 7] ¶ 1.) Magellan's principals, Chris Norman ("Norman") and Basel Kawouk ("Kawouk"), reside in Georgia. (Affidavit of Chris Norman [D.E. 9] ¶¶ 3, 8.)

For the last four-years, Defendants have maintained an on-going business relationship with Norman.  During 2011 and 2012, Norman brokered three separate transactions between DMP to a third party, Solidus Group, LLC.  [D.E 9 ¶ 5.] Also during 2011, Norman introduced March to Anthony Coppola of RJA Capital ("RJA") and consulted on a debt transaction between DMP and RJA. [D.E. 9 ¶ 6.] Each of these transactions involved telephone and email communications between March in New York and Norman in Georgia. [D.E. 9 ¶ 7.]

In 2013, Norman became a principal of Magellan.  [D.E. 9 ¶ 8.]  During 2013, Magellan worked with DMP on several occasions. For example:

- In March 2013, March asked Magellan help DMP establish direct selling relationships with Magellan's lender contacts.  [D.E. ¶ 9.]

- During August 2013, Magellan marketed a debt portfolio referred to as the "EZ Corp Debt" for DMP.  (Id.)

- During September 2013, Magellan marketed a portfolio of Canadian debt for DMP, resulting in a contingency placement of some of the files.  (Id.)

- In November 2013, DMP asked Magellan to market a $38 million dollar debt portfolio referred to as the "0-AGY Rent-A-Center Debt."  (Id.)

March and Valentine communicated with Norman and/or Kawouk in Georgia in connection with each of these efforts.  (Id.)

## 2.    The Subject Transactions

On February 13, 2014, Coppola contacted Norman about a purchasing debt from a portfolio referred to as the "Evergreen Debt" from DMP.  [D.E. 9 ¶ 10.] The following day, Valentine telephoned Norman to further negotiate the sale.  (Id.) Valentine represented to Norman that Magellan would receive all rights and title to and all interest in the debt it purchased, including the exclusive right to collect the debt. (Id.) Based on Valentine's representations and the long-standing relationship between Magellan and DMP, Magellan entered into an oral agreement with DMP whereby DMP agreed sell, and Magellan agreed to purchase, $3,999,372.00 of the

Evergreen Debt.  [D.E. 9 ¶ 11.]  Per Valentine's instructions, Norman wired payment for the purchase (the "February Purchase") to RJA.  (Id.) He then telephoned Valentine to confirm that the funds had been sent. (Id.)

In late February 2014, Norman and Kawouk met with March and Valentine at a conference in Orlando to negotiate a second purchase (the "March Purchase") of Evergreen Debt.  [D.E. 9 ¶ 14.]  Valentine and March represented to Norman and Kawouk that Magellan would receive all rights and title to and all interest in the debt it purchased, including the exclusive right to collect the debt. (Id.) Based on Valentine's and March's representations and the longstanding relationship between Magellan and DMP, Magellan entered into an agreement with DMP whereby DMP agreed to sell, and Magellan agreed to purchase, $5,000.022.00 of Evergreen Debt.  [D.E. 9 ¶ 15.]  Norman and Kawouk returned to Georgia, and the parties finalized the deal by telephone and email.  [D.E. 9 ¶ 16.]  On March 5, 2014, Valentine emailed a link to the accounts Magellan purchased to Magellan in Georgia. (Id. at ¶ 16.) The following day, Magellan wired funds from its bank in Georgia to DMP.  (Id.)

After completing the February and March Purchases, Magellan learned that nearly all of the debt it purchased was previously sold to another debt purchaser and was largely collected upon.  [D.E. 9 ¶ 18.]  Thus, Magellan did not obtain all rights and title to and the exclusive right to collect on the debt.

### 3.  Other Duplicate Sales by DMP

After Magellan discovered that the debt it purchased from DMP was double-sold, Magellan learned of other instances in which DMP sold the same debt to multiple buyers.  For instance, Magellan learned that DMP completed multiple sales of the same debt to URG Online and to other debt purchasers.  [D.E. 9 ¶ 19.]  Thus, Magellan contends that DMP's duplicate sales to Magellan were not isolated incidents but, instead, are part of pattern fraudulent activity.   To support this contention, Magellan intends to obtain testimony from witnesses throughout the country including but not limited to: (1) Joshua Minney of Magellan who resides in West Virginia; (2) Novea Asset Management representatives who reside in Florida; (3) National Credit Adjusters representatives who reside in Kansas; and (4) Brad Spoor of Debt Management Group who resides in Florida. [D.E. 9 ¶ 20.]

## III.  ARGUMENT AND CITATION OF AUTHORITY

### A.  Defendants are Subject to Personal Jurisdiction in this Court.[1]

Federal courts use a two part-test to determine whether a court may exercise personal jurisdiction over a nonresident.   Diamond Crystal Brands, Inc. v. Food

---

[1] Initially, Magellan notes that, although Defendants contend that they are not subject to this Court's jurisdiction, while before the Court, they should abide by its rules, including LR 7.1(D) which limits briefs filed in support of a motion to 25 pages. Notwithstanding this rule, Defendants filed a rambling 32-page brief attempting to over-complicate what should be straightforward, preliminary matters.

Movers Int'l, Inc., 593 F.3d 1249, 1257 (11th Cir. 2010).   First, the exercise of jurisdiction must be appropriate under the forum state's long arm statute.   Id. Second, the exercise of jurisdiction must not violate due process. Id. at 1257-58.

The plaintiff bears the initial burden of alleging in the complaint sufficient facts to make a prima facie case for personal jurisdiction over a nonresident.   Id. at 1257.   If the defendant challenges jurisdiction and supports the challenge with affidavit evidence, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction.   Id.   "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavit, *the court must construe all reasonable inferences in favor of the plaintiff.*"   Id. (emphasis added).   Construing all disputed facts in favor of Magellan, Magellan has shown that Defendants are subject to this Court's jurisdiction.

### 1.      Jurisdiction is Appropriate Under Georgia's Long-Arm Statute.

Georgia's long arm statute provides, in relevant part, that a Georgia court may exercise personal jurisdiction over a nonresident if he or she "[t]ransacts any business within this state . . . ." O.C.G.A. § 9-10-91(1).

The long arm statute is to be literally construed.   Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, 279 Ga. 672, 675 (2005).  Thus, the long arm statute is satisfied if a nonresident transacts *any* business in this State,

whether by phone, mail, or other "intangible" means, even if he does not physically enter the state.  Id. at 675.  Moreover, an individual is not shielded from personal jurisdiction in connection with contacts made in a corporate or representative capacity.  See Amerireach.com, LLC v. Walker, 290 Ga. 261, 267 (2011) (expressly rejecting the so-called "fiduciary shield doctrine" as a basis for avoiding personal jurisdiction based on contacts made in a representative capacity).

Defendants' contacts with Georgia satisfy the first prong of the Georgia long arm statute.  This is not even a close call.  Initially, the Amended Complaint alleges an on-going business relationship between Defendants and Magellan. [D.E. 7 ¶ 8.] The Amended Complaint further alleges that the disputes in this case arise out of two contracts between DMP and Magellan, a Georgia LLC.  [D.E. 7 ¶¶ 1, 9-13, 25-26, 29-30.]  Moreover, Magellan's allegations concerning Defendants' transaction of business in this State are more than supported by the evidence submitted in the Affidavit of Chris Norman.

Mr. Norman's affidavit details multiple business transactions over a four-year period between DMP and its principals in New York and Magellan and its principals in Georgia.  During that time, the individual Defendants, March and Valentine, engaged in telephone and email communications with Magellan and its principals in Georgia concerning multiple completed and proposed business transactions,

including the two transactions at issue in this litigation. Defendants' repeated contacts with Georgia residents for the purpose of establishing a business relationship with a Georgia company, and that resulted in business transactions with that company, satisfy the first prong of Georgia's long-arm statute.

## 2.    The Exercise of Personal Jurisdiction Comports with Due Process.

The Due Process Clause of the Fourteenth Amendment constrains a federal court's power to exercise personal jurisdiction over a nonresident defendant. U.S. S.E.C. v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997). For due process to be satisfied, a nonresident must have purposefully established minimum contacts with the forum state, and jurisdiction must not offend traditional notions of fair play and substantial justice. Id.

### (a)    Defendants Established Minimum Contacts with Georgia.

A nonresident's contacts with the forum state satisfy the requirements for specific personal jurisdiction if the contacts give the defendant "fair warning" that he may be haled into court in that state.[2] A nonresident need not physically enter the forum state to be subject to its jurisdiction. Burger King v. Rudzewicz, 471 U.S. 462, 476 (1985). Rather, a nonresident has "fair warning" that he may have to defend a

---

[2] Specific personal jurisdiction exists when the defendant's contacts with the state are related to the cause of action being litigated. Madara v. Hall, 916 F.2d 1510, 1516 n.7. In contrast, "[g]eneral jurisdiction arises from a party's contacts with the forum state unrelated to the litigation." Id.

lawsuit in the state if he: (1) "purposefully directed" contacts at the forum; and (2) the litigation results from his contacts directed at the forum.  Madera, 916 F.2d at 1516.

### (i)  Defendants Purposefully Directed Contacts with Georgia.

Defendants purposefully contacted Magellan and its principals in Georgia. Beginning in 2011, DMP's principal, March, reached into Georgia through telephone and email communications with Norman.  During 2011 and 2012, March engaged in telephone and email contacts with Norman in Georgia concerning four separate transactions. [D.E. 9 ¶¶ 5-7.] During 2013, March again reached into Georgia through telephone and email communications concerning Magellan's efforts to market multiple debt portfolios for DMP.  [D.E. 9 ¶ 9.]

DMP's other principal, Valentine, also purposefully directed contacts into Georgia. During 2013, Valentine communicated with Magellan in Georgia by telephone and by email concerning Magellan's marketing of multiple debt portfolios for DMP.  (Id.)  Furthermore, Valentine contacted Magellan in Georgia concerning the February and March Purchases. Such contacts include telephone and email communications concerning terms of the March Transaction.  [D.E. 9 ¶¶ 10, 12, 16.] In addition, Magellan wired funds to DMP from Magellan's bank in Georgia.  [D.E. 9 ¶ 16.]

### (ii)   This Litigation Arises out of Defendants' Contacts With the State.

DMP's contacts with Georgia, beginning with March's communications with Norman in 2011, led to an on-going business relationship between DMP and Norman, and later Magellan.  As a result of this relationship, as well as March's telephone and email contacts with Magellan in Georgia during 2013, Magellan marketed multiple debt portfolios for DMP. [D.E. 9 ¶ 9.]   Moreover, March's contacts with Norman led to the two transactions at issue in this litigation. Thus, this litigation is a direct result of DMP and March's purposeful contacts with Georgia.

This litigation also arises out of Valentine's contacts with Georgia.  In fact, Valentine's communications with Magellan in Georgia were critical to the completion of the two transactions at issue.  Such contacts include: (1) telephone communications with Norman concerning the terms of the February Transaction; and (2) email communications with Norman concerning terms of the March Transaction. (Norman Aff. ¶¶ 10, 12, 16.) In addition, Magellan wired funds to DMP from Magellan's bank in Georgia.  (Id. at ¶ 16.)

### (b)   The Exercise of Jurisdiction Over Defendants Does Not Offend Traditional Notions of Fair Play and Substantial Justice.

Personal jurisdiction may be defeated if such jurisdiction would offend traditional notions of "fair play and substantial justice."  Madara, 916 F.2d at 1517

(1990).  In this regard, "[r]elevant factors include the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute."  Licciardello v. Lovelady, 544 F.3d 1280, 1288 (11th Cir. 2008). To defeat jurisdiction, a nonresident must present a compelling case that jurisdiction is unreasonable.  Burger King, 471 U.S. at 477 (1985).

Here, exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.  Fair play and substantial justice suggests that a Georgia plaintiff who was injured by the conduct of a nonresident should not be required to travel to a foreign state to obtain a remedy.  See, Licciardello, 544 F.3d at 1288.  Furthermore, Georgia has a substantial interest in providing a forum in which its citizens can obtain relief for their injuries, Georgia courts are capable of resolving this dispute, and there is no suggestion that adjudicating in a different forum would further any fundamental social policy.  Thus, this Court's exercise of personal jurisdiction does not violate notions of fair play and substantial justice, and this Court may exercise personal jurisdiction over Defendants.

**B.**   **RJA is Not a Required Party.**

Federal Rule of Civil Procedure 19 "states a two-part test for determining whether a party is indispensable."  Challenge Homes, Inc. v. Greater Naples Care

Center, Inc., 669 F.2d 667, 669 (11th Cir. 1982). The first part of the test requires the court to determine whether: (1) complete relief can be afforded without the absent party; or (2) the nonparty's absence will impede its ability to protect some interest in the subject matter of the litigation or subject the parties to multiple or inconsistent obligations. Fed. R. Civ. P. 19(a). Every party whose conduct is at issue in litigation is not a required party. 669 F.2d at 669. Even where facts concerning a nonparty's conduct are litigated, he is not required unless he is legally bound by the outcome of the litigation. Id. If a nonparty is required, it must be joined if feasible. Id.

None of the Rule 19(a) factors for requiring joinder is present in this case.

*First*, the Court can award complete relief without RJA. The only relief that Magellan seeks is monetary damages from Defendants, which the Court may award in RJA's absence. Defendants' concern that it may choose to seek indemnification from RJA does not affect the Court's ability to afford complete relief. To the contrary, it is well-established that "[t]he complete relief provision of 19(a) does not concern any subsequent relief via contribution or indemnification for which the absent party might later be responsible." U.S. v. Janke, No. 09-14044-CIV, 2009 WL 2525073, at *2 (S.D. Fla. Aug. 17, 2009). See also, Challenge Homes, 669 F.2d 667 (11th Cir. 1982) (holding that it was not necessary to join an absent party against whom the defendant might wish to seek indemnification).

*Second*, RJA's absence will not impede its ability to protect its interests. Defendants contend that if RJA is not a party in this case, then its interests may be impaired in a future indemnification action.  This is not so.  The Eleventh Circuit has long held that because a court's decision is not binding upon a nonparty, a person's absence from a case does not impair its ability to protect its interest in subsequent litigation. Challenge Homes, 669 F.2d at 669.   Thus, even if Defendants seek indemnification from RJA, its interests are not impaired by its absence from this case.

*Third*, RJA's absence will not subject Defendants to multiple or inconsistent obligations. Magellan's claims in this case arise out of Defendants' breach of contract and fraud in connection with two transactions between Magellan and DMP. Defendants do not identify any way that RJA's absence could subject Defendants to multiple or inconsistent obligations for Magellan's claims and, in fact, there is none.[3]

## C.   Magellan Has Stated Plausible Claims.

### 1.    Standard for Motion to Dismiss for Failure to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"

---

[3] Even if the Court somehow determines that RJA is required, the Court should still deny Defendants' Motion to Dismiss and instead joinder of RJA.  See Rule 19(a)(2) (providing that if a required person is not joined, "the court must order that the person be made a party.")   Should the Court order joinder of RJA, Magellan is prepared to show that RJA is subject to personal jurisdiction in this Court.

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A complaint need not contain detailed factual allegations but only enough facts to state a claim to relief that is plausible on its face. Speaker v. U.S. dept. of Health and Human Servs. Ctrs for Disease Control and Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010). "In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff." Id.

In general, a court's consideration of a motion to dismiss under Rule 12(b)(6) must be limited to the allegations in the pleadings.  Id.  In fact, if a court considers matters outside the pleadings, the motion must be treated as one for summary judgment.    Rule  12(d).    Nonetheless,  Defendants  attempt  to  support  their arguments by introducing in their brief "facts" that are not part of the pleadings. [See D.E. 14-1, p. 3, 19-20.]  Defendants' attempt to rely on "facts" outside of the pleadings belies their argument that that Amended Complaint fails to state a plausible claim.

**2.    Magellan Has Stated A Plausible Breach of Contract Claim.**

The allegations in the Amended Complaint concerning Magellan's breach of contract claim include:

(1)   that in February 2014, Magellan and DMP entered into an oral

agreement whereby DMP agreed to sell and Magellan agreed to purchase $3,999,372.00 in outstanding debt for $87,500, [D.E.7 ¶ 25];

(2)    that the parties' February 2014 agreement (the "February Contract") required DMP to provide Magellan all rights, title, and interest in $3,999,372.00 in outstanding debt, including the exclusive right to collect that debt, (id. ¶ 27);

(3)    that in March 2014, Magellan and DMP entered into an oral agreement whereby DMP agreed to sell, and Magellan agreed to purchase, all rights and title to and all interest in $5,000,022.00 in outstanding debt for $200,000.88, (id. ¶ 29);

(4)    that parties' March 2014 agreement (the "March Contract") required DMP to provide Magellan all rights, title, and interest in $5,000,022.00 in outstanding debt, including the exclusive right to collect that debt (id. ¶ 31); and

(5)    that DMP breached the February Contract and the March Contract because DMP did not provide Magellan all rights and title to and all interest in the debt it purchased, including the exclusive right to collect the debt, (id. ¶¶ 20, 28, 32).

Despite these clear allegations, Defendants claim that the Amended Complaint lacks "any meaningful detail" about the parties' agreements and fails to identify any term that was breached.  [D.E. 14-1, p. 18-19.]  This argument is not credible. As shown above, the allegations in the Amended Complaint state specific agreements for Magellan to sell a defined product (an agreed-upon amount of debt) for a stated price.

The Amended Complaint also states the specific term of each contract that DMP breached (its obligation to provide Magellan all rights, title, and interest in the subject debt, including the exclusive right to collect that debt).  Thus, the Amended Complaint states a plausible breach of contract claim.

### 3.      The Amended Complaint States Plausible Claims for Fraud and Negligent Misrepresentation.

Generally, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). However, in averments of fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Federal courts have interpreted Rule 9(b) to require a plaintiff to allege "facts as to time, place, and substance of the defendant's alleged fraud."  U.S. ex rel. Clusen v. Laboratory Corp. of Am., Inc., 290 F.3d 1301, 1308 (11th Cir. 2002).  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

In this case, the Amended Complaint alleges: (1) that during a February 14, 2014 telephone call, Valentine represented to Norman that Magellan would receive all rights and title to and all interest in the debt comprising the February Purchase, including the exclusive right to collect the debt; (2) that on February 27, 2014, during a face-to-face meeting between DMP and Magellan at a conference in Orlando, Florida, Valentine and March represented to Norman and Kawouk that Magellan

would receive all rights and title to and all interest in the debt comprising in the March Purchase, including the exclusive right to collect the debt; and (3) that those statements were false.  [D.E. 7 ¶¶ 36-38.]  These allegations, which state the time, place and substance of Defendants' fraud are sufficient under Rule 9(b).

Furthermore, the Amended Complaint generally alleges that Defendants knew, or should have known, that their misrepresentations were false when made and that they made those statements to induce Magellan to make the February and March Purchases.  [D.E. 7 ¶¶ 39, 41.]  In addition, the Amended Complaint alleges that persons in Defendants' position acting with reasonable case would have known that their statements were false.  [D.E. 7 ¶ 48.]  These allegations, together with the allegations of Defendants' specific fraudulent statements, state plausible claims for fraud and negligent misrepresentation.

Defendants disingenuously point to certain language in the bills of sale to argue that Magellan could not reasonably rely on Defendants' false statements. Specifically, Defendants claim that because the bills of sale state that DMP does not warrant "collectability," Magellan could not have relied on Defendants' representations that Magellan would have the sole right to collect the debt.  [D.E. 14-1, p. 24-25.]  Defendants are well-aware that the collectability of a debt refers to whether the debtor pays the debt, not whether DMP has granted multiple companies

the right to collect the debt and that the bills of sale have nothing to do with Defendants' fraud.

**4.    Magellan Has Stated A Plausible Claim for Violation of the Georgia RICO Act.**

The Georgia RICO Act makes it unlawful for any person to acquire an interest in any property, including money, through a pattern of racketeering activity.  O.C.G.A. §16-14-4(a).  In this regard, a "pattern of racketeering activity" includes at least two acts in furtherance of any racketeering activity identified under 18 U.S.C. § 1961, which activities include mail and wire fraud.  O.C.G.A. § 16-14-3(9)(A)(xxix), 18 U.S.C. § 1961, 18 U.S.C. § 1343.

Magellan has stated a plausible RICO claim.  Specifically, the Amended Complaint alleges that Defendants defrauded Magellan in connection with the February and March Purchases.  [D.E. 7 ¶¶ 36-45.]  The Amended Complaint further alleges that Defendants used email and bank wires in connection with their fraudulent conduct and that such fraud was part of a scheme that included not only at least two instances of fraud against Magellan but also similar fraudulent conduct against others.  [D.E.7 ¶¶ 53-61.]  In addition, Magellan alleges that Defendants acquired money as a result of their fraudulent conduct.  [D.E. 7 ¶ 62.]  Such allegations state a plausible RICO claim upon which relief can be granted.

**5.     Magellan Has Stated Plausible Claims for Punitive Damages and Attorney's Fees.**

Georgia law provides for punitive damages in connection with tort claims to penalize, punish, or deter a defendant who has acted with "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."   O.C.G.A. § 51-12-5.1. Georgia law provides for an award of attorney's fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. O.C.G.A. § 13-6-11.  Both punitive damages and attorney's are appropriate in this case.

Defendants' conduct demonstrates such willful and fraudulent misconduct and conscious indifference to consequences as to warrant punitive damages.  Defendants purposefully defrauded Magellan by selling Magellan debt that Defendants knew had previously been sold to others and either collected upon or determined to be uncollectible.   Defendants defrauded Magellan not once, but twice, and similarly defrauded other buyers.  Moreover, even after Magellan confronted Defendants with evidence that the debt it sold Magellan was double-sold, Defendants failed and refused to cooperate with Magellan to reach a reasonable resolution.  Such willful fraud not only justifies, by practically cries out for, an award of punitive damages.

In addition, DMP's conduct evidences such stubborn litigiousness as to warrant

an award of attorney's fees.  Magellan presented DMP with evidence that it breached the February and March Contracts by selling Magellan debt to which Magellan did not acquire all rights and title including the exclusive right to collect the debt. Notwithstanding this evidence, DMP refused to refund Magellan the amount it paid for the debt and refused to cooperate with Magellan to reach a reasonable solution. As a result, Magellan was forced to litigate and should be awarded its attorney's fees.

**D.   Venue is Proper In this Court.**

**1.   Venus is Proper Under 28 U.S.C. § 1441.**

When a case it removed based on diversity, venue is established under 28 U.S.C. § 1441 which provides for removal "to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Here, Magellan filed this case in the Superior Court of DeKalb County.  As this Court embraces the court in which this case was pending prior to removal, venue is proper.

**2.   The Balance of Conveniences Does Not Support Transferring this Case to New York.**

28 U.S.C. § 1404(a) allows a court to transfer a civil action if, on the whole, the transfer makes the litigation more convenient for the parties and witnesses and facilitates the interest of justice. Moore v. McKibbon Bros., Inc., 41 F.Supp.2d 1350, 1356 (N.D. Ga. 1998).  A defendant moving to transfer carries the substantial burden

of establishing the propriety of the transfer.  Id.  "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839 (1947)). "Transfer should be denied if it would merely shift inconvenience from one party to another."  Id.

Defendants have not satisfied their heavy burden of showing that the relevant factors strongly favor transfer because: (1) the convenience of the parties is equal in Georgia and New York; (2) the convenience of the witnesses is equal in either forum; and (3) the interest of justice is served by having the case decided in Georgia.

First, transferring the case to the Western District of New York would not lessen the burden on the parties but would merely shift the inconvenience of litigating in a distant forum from Defendants to Magellan. Since New York would not be more convenient for the parties, consideration of the first factor indicates that case should remain in Georgia.

Second, Magellan anticipates that this case will require testimony from witnesses across the country.  In addition to the New York witnesses identified by Defendants, Magellan anticipates that key witnesses will include: (1) Magellan's principals, Norman and Kawouk, who reside in Georgia; (2) Joshua Minney, a resident of West Virgina; (3) Gila Brock, a resident of Florida; (4) David Mizrahi, a

resident of Florida; (5) Brad Hochstein, a resident of Kansas; (6) Jack Mahoney, a resident of Kansas; and (7) Brad Spoor, a resident of Florida.  Thus, transferring this case to New York would not be more convenient most witnesses, and this factor does not favor transfer.

Third, the interest of justice would be best served by keeping this case in Georgia.  Magellan is a Georgia company.  As alleged in the Complaint, Defendants breached their contracts with Magellan and defrauded it out of over a quarter of a million dollars.  Georgia has an interest protecting its citizens from such wrongful conduct. On the other hand, the only reason that Defendants suggest that justice would be better served by transferring the case to New York is that RJA is not subject to personal jurisdiction in this Court.  However, as shown above, RJA is not a necessary party and, in any event, it is subject to jurisdiction in this Court.  Therefore, on balance, justice favors maintaining venue in Georgia, and Defendants' request to transfer this case should be denied.

## IV.  CONCLUSION

Defendants have not provided any valid reason for the Court to dismiss this case.  Defendants have enjoyed the benefits of a four-year business relationship with Georgia-based Magellan and are subject to jurisdiction in this Court. Magellan has stated multiple claims against Defendants that more than satisfy the Twomby/Iqbal

pleading requirements and have not failed to join any party because Defendants'

possible indemnification claim against RJA does not make it a required party in this

case.   Furthermore, this case should move forward in this because New York does

not provide a more convenient venue and, in any event, justice is best served by

providing injured Georgia residents a convenient forum in which to address their

harms.   Accordingly, Magellan respectfully requests that the Court deny Defendants'

Motion to Dismiss or Transfer Venue and allow this case to proceed on the merits.

This 9th day of February, 2015.

/s/ Bryan M. Knight
_____
Bryan M. Knight
Georgia Bar No. 142401
Sherri G. Buda
Georgia Bar No. 093399

KNIGHT JOHNSON, LLC
One Midtown Plaza
1360 Peachtree Street, Suite 1201
Atlanta, Georgia 30309
P: (404) 228-4822
F: (404) 228-4821
bknight@knightjohnson.com
sbuda@knightjohnson.com

*Attorneys for Plaintiff*

## <u>CERTIFICATION UNDER L.R. 7.1D</u>

Pursuant to Northern District of Georgia Local Rule 7.1D, the undersigned hereby certifies that the above and foregoing Response to Defendants Motion To Dismiss or Transfer Venue was prepared using Times New Roman 14 point font, an acceptable font pursuant to Local Rule 5.1B.

This 9th day of February, 2015.

<u>/s/ Bryan M. Knight</u>
Bryan M. Knight
Georgia Bar No. 142401

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MAGELLAN TRADING COMPANY,
LLC,

      Plaintiff,

v.

DEBT MANAGEMENT PARTNERS,
LLC, ADAM MARCH, and
DANIEL VALENTINE,

      Defendants.

Civil Action File
No: 1:14-CV-03928-MHC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served the foregoing PLAINTIFF'S RESPONSE

TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE by filing

same through the Court's CM/ECF system, which will automatically send email

notification of such filing to:

Theodore B. Eichelberger
Aaron Karl Block
Alston & Bird LLP
One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia 30309

Gerald Walsh
David Gutowski
Zdarsky, Sawicki & Agostinelli LLP
Suite 404
298 Main Street
Buffolo, NY 14202

Respectfully submitted this 9th day of February, 2015.

/s/ Bryan M. Knight
Bryan M. Knight, Esq.
Georgia Bar No. 142401